# Expert Declaration

# EXPERT DECLARATION OF LAUREN ELIZABETH KOIS, PhD

## I. SUMMARY OF EDUCATION AND PROFESSIONAL EXPERIENCE

I, Lauren Elizabeth Kois, Ph.D., upon oath and under penalty of perjury, and upon personal knowledge, state:

I am a clinical psychologist with expertise in psychology and law. My clinical, research, and consulting work focus on enhancing the quality, efficiency, and implementation of forensic mental health services in the public sector. I obtained my Doctorate in Psychology from The Graduate Center at the City University of New York (John Jay College's Clinical Psychology-Law program) in New York City. My academic and applied clinical training emphasized assessing and treating individuals with severe mental illness; culturally diverse, high-risk, and under-resourced populations; and those involved in or otherwise impacted by the criminal legal system. As a doctoral student I gained clinical experience via Project SHARP (*Stopping Harassment and Relationship Problems*), the Queens and Brooklyn Mental Health Courts, Kingsboro Psychiatric Center, St Luke's-Roosevelt Hospital's Inpatient Addiction Institute, Federal Correctional Complex Butner (including daily solitary confinement clinical rounds), and the University of North Carolina School of Medicine's Forensic Clinic. I also completed formal coursework, research, and practicum in cognition and brain-behavior with a focus on neuropsychology. In addition to extensive clinical psychology-law training, I gained neuropsychology experience via New York University's Epilepsy Center, Mount Sinai's Dementia Clinic, and North Carolina's Central Regional Hospital.

I maintain a private forensic evaluation practice and am retained as a forensic mental health expert by both plaintiffs and defendants in civil litigation throughout the country (e.g., Alabama, California, the District of Columbia, New York, North Carolina, Oklahoma, Texas, Virginia, and Washington). I also direct a jail-based competence to stand trial restoration program as well as a financial empowerment intervention program for mental health court participants. Previously I served as an Assistant Professor of Psychiatry and Neurobehavioral Sciences at the University of Virginia School of Medicine's Institute of Law, Psychiatry, and Public Policy. Prior to joining the University of Virginia, I served as core faculty of the University of Alabama's Clinical Psychology-Law doctoral program. Over the years I have taught Psychology and Law and Criminal Forensic Assessment courses and seminars to doctoral, postdoctoral, and professional trainees. I have trained thousands of mental health and legal professionals in matters of competence evaluation and restoration standards and practices throughout the country. In addition, I have published 39 scholarly works and presented at regional, national, and international conferences. My contributions to the scientific literature typically center on forensic and carceral mental health assessment and treatment. I have published peer-reviewed research on head injury and neuropsychological functioning among forensic and carceral populations.

My full qualifications and publications are detailed in my curriculum vitae.

## II. BACKGROUND AND FOCUS OF DECLARATION

This Declaration is submitted in response to Plaintiff's requests for my input regarding the serious harms of solitary confinement, particularly for individuals with serious mental illness (SMI), Posttraumatic Stress Disorder (PTSD), and traumatic brain injury (TBI). My response is informed by national organizational standards including the National Commission on Correctional Health Care's *Standards for Mental Health Services in Correctional Facilities*[1] and the American Psychiatric Association's *Guidelines on Psychiatric Services in Correctional Facilities,*[2] as well as the empirical literature and my professional experience.

Plaintiff Tucker was diagnosed with PTSD with Dissociative Symptoms[3] by PA DOC providers in 2019. The PA DOC ultimately diagnosed him with Mild Neurocognitive Disorder Due To Known Physiological Condition[4] in 2024. Although Plaintiff Tucker was not formally diagnosed with TBI by the PA DOC following his 04/20/17 fall from the tier at SCI Dallas, it is my professional opinion that he did sustain a TBI during this incident. The circumstances of the fall underscore the severity of trauma that occurred. A fall from a second-story prison tier, striking his head upon impact, constitutes an injury mechanism with substantial force.

Falls from heights exceeding 10 feet with direct head impact, particularly one resulting in scalp lacerations severe enough to require multiple sutures, carry a high probability of causing TBI regardless of initial presentation or imaging results. The combination of Plaintiff Tucker's documented loss of consciousness ("no memory of the fall"[5]), the severity of trauma (seven staples), and his subsequent cognitive and behavioral symptoms following this incident strongly support a TBI diagnosis. Normal CT scans are common in mild-to-moderate TBI, as structural imaging frequently fails to detect the functional brain changes that cause persistent symptoms. Had the PA DOC conducted appropriate neuropsychological assessment using recommended standardized cognitive testing protocols following his documented head injury, they would have identified the characteristic cognitive deficits consistent with TBI.

The evidence supports that PA DOC leaders were aware of the potential likelihood that Plaintiff Tucker had sustained a TBI even though he lacked a formal diagnosis at the time of his Restricted Release List (RRL) placement. Most significantly, on 09/26/19, Plaintiff Tucker wrote directly to Defendant Wetzel sharing his detailed history of head trauma from his April 2017 fall at SCI Dallas, describing the range of debilitating symptoms he experienced following the injury, including visual disturbances, atypical eye movements while awake, persistent headaches, sleep

---

[1] National Commission on Correctional Health Care. (2015). *Standards for mental health services in correctional facilities*.

[2] American Psychiatric Association. (2016). *Psychiatric services in correctional facilities* (3rd ed.). Author.

[3] Post-Traumatic Stress Disorder with Dissociative Symptoms is a specific subtype of PTSD where individuals experience not only the typical trauma-related symptoms like flashbacks and hypervigilance, but also significant dissociative episodes such as depersonalization (feeling detached from oneself) or derealization (feeling that surroundings are unreal or dreamlike). This subtype is a more severe form of PTSD that typically develops following particularly intense or prolonged traumatic experiences and often requires specialized treatment approaches that address both the trauma symptoms and the dissociative episodes.

[4] Mild Neurocognitive Disorder Due To Known Physiological Condition is a condition in which a person experiences a modest decline in cognitive abilities (like memory or thinking) due to a specific, identifiable medical issue, but this decline does not significantly interfere with their daily life or ability to function independently.

[5] Kois, Lauren. (2025). Clinical forensic evaluation of Hassan Tucker.

difficulties, and crying spells—all symptoms he explicitly stated he "did not experience prior to falling on my head in 2017."[6] Just weeks later, he was placed on RRL on 11/18/19. Despite this direct communication detailing clear TBI-related symptoms in addition to PA DOC documentation of his fall from the tier, there are no indications his head injury was appropriately assessed, addressed, or taken into serious consideration during the RRL placement process. This is particularly concerning given that Defendant Little's deposition testimony[7] reveals that leadership had exposure to research presentations about how head injuries and concussions can impact behavior in the carceral population, demonstrating that PA DOC leadership possessed knowledge about TBI effects that should have prompted proper evaluation of Plaintiff Tucker's disclosed symptoms and vulnerabilities.

Of note, the bulk of empirical research on head trauma and solitary confinement focuses specifically on TBI (a clinically diagnosed condition involving both brain injury and resulting functional impairment) rather than general “head injury” alone. To accurately represent this research literature throughout this declaration, I refer to TBI when discussing the clinical condition that affects an individual's cognitive, emotional, and behavioral functioning—which is what the research demonstrates creates heightened vulnerability to solitary confinement harms.

## III. EXECUTIVE SUMMARY

Solitary confinement has profound potential to inflict psychological harm, and risk for harm is intensified for incarcerated individuals with TBI and PTSD. Through a review of the research and best practice literature, this declaration establishes that individuals such as these face heightened vulnerability to isolation due to specific neurobiological factors. Solitary confinement can worsen their existing symptoms, impede cognitive functioning, and create a problematic pattern where symptom manifestations are misidentified as deliberate misconduct, potentially resulting in extended isolation. Several carceral systems have successfully implemented alternatives to solitary confinement for persons with mental illness and marked cognitive deficits by incorporating trauma-informed interventions, appropriate neurocognitive accommodations, and therapeutic programming that address these "responsivity needs" as stabilization factors necessary for effective rehabilitation and institutional safety.

## IV. DEFINITION AND CONDITIONS OF SOLITARY CONFINEMENT

Various terms describe the practice of removing and isolating incarcerated individuals from an institution's general population for safety or security reasons. Commonly used labels include *segregation, Restrictive Housing Units* (RHU), *Security/Segregated Housing Units* (SHU), *Intensive Management Units* (IMU), and Supermax. However, the most frequently used are *Restrictive Housing* (RH) and *Solitary Confinement* (SC). For the purposes of this report, these terms will be used interchangeably, with specific terminology from individual studies referenced as needed.

---

[6] Tucker, Hassan. (2019). Pennsylvania Department of Corrections Inmate Correspondence #2019-C27-000000333 addressed to Defendant Little.

[7] George Little Dep. (July 10, 2025), *Tucker v. Wetzel*, No. 1:22-CV-00631 (M.D. Pa. 2025).

RH practices typically involve placing an individual in a locked room or cell, alone or with another incarcerated person, for 22 or more hours a day. Individuals in RH usually have few meaningful social interactions or out-of-cell activities. Their movements are highly restricted (in terms of leaving their cell *and* security measures outside of the cell, such as mandatory cuffs and shackles). They may experience sensory deprivation or overstimulation, go without access to basic needs and amenities, and feel degraded or dehumanized by the profound restrictions placed on them. The American Psychiatric Association (APA), the American Correctional Association (ACA), and the National Commission on Correctional Healthcare (NCCHC) have established different criteria for defining prolonged segregation. The APA and ACA consider segregation to be prolonged when it exceeds 30 consecutive days, while the NCCHC sets the threshold at 15 consecutive days. The more severe the conditions of confinement and prolonged length of stay, the greater the likelihood that SC will lead to psychological harm.

Incarcerated individuals may be placed in SC for the purpose of *Disciplinary Segregation* (DS) or *Administrative Segregation* (AS). DS, also known as punitive segregation, is intended to punish specific misconduct or rule violations. Notably, however, research on DS has revealed that placement in DS had no impact on subsequent levels of serious in-prison adjustment or misconduct.[8,9] DS length of stay is typically predetermined based on the severity of the infraction, with sentences such as 30 days being common. Thus, in the context of DS, individuals usually can "see a light at the end of the tunnel." In contrast, AS is intended as a preventative strategy to isolate individuals deemed to be the most dangerous in the facility. Unlike DS, placement in AS is often associated with an *indeterminate time frame*, meaning that the restricted individual is not provided with information regarding when they will be released from RH. The rationale behind the use of AS has limited empirical support. Studies examining the impact of supermax units in Illinois provided mixed evidence over time.[10,11] Others found no effect at all.[12,13]

A defining feature of these programs is the significantly reduced interpersonal contact and activity. Individuals in RH are typically housed in cells measuring approximately 6 by 8 feet, furnished with a metal toilet, sink, and bed platform. Some cells have a small window that allows sunlight, while others do not. Most forms of RH allow roughly one hour of exercise or recreational activity out of cell, five days a week. Even during this time, individuals are either isolated or fenced off from others. Showers are allowed out of cell a few times a week, and all transportation to and from

---

[8] Clark, V. A., & Duwe, G. (2017). The effects of restrictive housing on recidivism: A longitudinal examination of disciplinary segregation and discretionary segregation placements in Minnesota. *Criminal Justice Policy Review*, 28(4), 347-364. https://doi.org/10.1177/0887403415585139

[9] Labrecque, R. M., & Smith, P. (2019). Assessing the impact of time spent in restrictive housing confinement on subsequent measures of institutional adjustment among men in prison. *Criminal Justice and Behavior*, 46(10), 1445-1455. https://doi.org/10.1177/0093854819869116

[10] Sundt, J. L., Castellano, T. C., & Briggs, C. S. (2008). The sociopolitical context of prison violence and its control: A case study of supermax and its effect in Illinois. *The Prison Journal*, 88(1), 94-122. https://doi.org/10.1177/0032885507310994

[11] Briggs, C. S., Sundt, J. L., & Castellano, T. C. (2003). The effect of supermaximum security prisons on aggregate levels of institutional violence. *Criminology*, 41(4), 1341-1376. https://doi.org/10.1111/j.1745-9125.2003.tb01022.x

[12] Mears, D. P., & Bales, W. D. (2009). Supermax incarceration and recidivism. *Criminology*, 47(4), 1131-1166. https://doi.org/10.1111/j.1745-9125.2009.00171.x

[13] Lovell, D., Johnson, L. C., & Cain, K. C. (2007). Recidivism of supermax prisoners in Washington State. *Crime & Delinquency*, 53(4), 633-656. https://doi.org/10.1177/0011128706296466

the cell occurs under security protocols and physical restraints. Meals, medications, mail, and any other property are delivered through a door slot, with most interactions with officers or other staff happening through the cell door. The types of possessions and privileges available to those in RH vary by facility or even within the same institution. While most RH programs allow some access to reading materials, mail, legal documents, and art supplies, many restrict access to electronic devices, commissary, visitation, and phone calls. In-person visitations, when permitted, are non-contact, with a partition preventing physical contact.

RH placements are associated with a clinically significant increase in somatic concerns, including skin irritations and weight fluctuations caused by the restrictive living conditions of SC; untreated and mistreated chronic medical conditions resulting from restrictive healthcare policies in solitary units; and musculoskeletal pain that was exacerbated by both the physical conditions and policies of SC.[14]

Additionally, placement in RH significantly limits access to resources known to improve recovery and rehabilitation, such as mental health programming, educational and religious activities, library access, and physical exercise. In some jurisdictions, group activities may be offered while all participants are fully restrained. Mental health treatment in these settings is often restricted to short check-ins conducted through the cell door, where conversations can be easily overheard by staff and other individuals confined in the unit. This lack of privacy and confidentiality may discourage those in need from openly discussing their mental health concerns or seeking the support they require, as they fear their personal struggles will be exposed to others nearby. Consequently, this limitation in the treatment approach could lead to individuals not receiving the adequate care and attention necessary to address their mental health needs effectively.

## V. SERIOUS PSYCHOLOGICAL HARMS OF SOLITARY CONFINEMENT

SC has long been a controversial practice, and researchers have conducted a wealth of empirical work in recent decades. They have found that SC can cause significant psychological suffering and serious harm by:

- exacerbating psychiatric symptoms for those with pre-existing psychiatric disorders;
- triggering new onset of mental health symptoms for those without pre-existing disorders;
- significantly increasing the risk of self-harm and suicide beyond that of general incarceration;
- depriving individuals from accessing basic human needs;
- restricting or even preventing access to activities that are known to promote rehabilitation and recovery (e.g., family visits, mental health treatment, educational/spiritual activities) physical exercise, and contacts with the outside world.

For many, prolonged SC is known to cause depression, anxiety, panic, ruminating thoughts, social withdrawal, hypervigilance, paranoia, irrational anger and irritability, difficulties with attention

[14] Strong, J. D., Reiter, K., Gonzalez, G., Tublitz, R., Augustine, D., Barragan, M., ... & Blair, T. R. (2020). The body in isolation: The physical health impacts of incarceration in solitary confinement. *PLoS One*, *15*(10), e0238510.

and memory, antisocial behaviors and violence, and suicidal behaviors.[15,16] For a minority, SC can induce unusual perceptual experiences, such as auditory or visual hallucinations. Even though most individuals report mental health improvements after release from segregation, prolonged segregation forces people to develop unhealthy adaptations to a pathological and unusual environment (e.g., social withdrawal, mistrust, hypervigilance, ongoing anxiety, anger, and for some, ongoing suicidal thoughts, and posttraumatic stress symptoms) that can persist even upon their re-entry to the community.[17, 18] Not everyone in SC reacts equally or experiences all or any of the many adverse reactions described by the literature; SC's impact is mediated by its conditions of confinement and available treatment.

Research conducted within the Pennsylvania Department of Corrections (PA DOC) followed 87 incarcerated men who were initially interviewed while in SC and then re-interviewed after transitioning to the general prison population, providing rare longitudinal data on the effects of extreme isolation.[19] Researchers measured three key dimensions of penal harm among these PA DOC inmates: material deprivation, social isolation, and psychological distress. They found that SC was associated with extreme material deprivation, including inadequate hygiene (43.7% vs. 1.6% in general population), inadequate clothing (37.9% vs. 3.2%), and frequent hunger (69.0% vs. 47.6%). Social isolation was particularly severe, with 88.5% of those in SC receiving no visits compared to 41.3% in general population, and 71.2% having no cellmate versus 14.2% in general population. The psychological distress experienced by those in SC was significantly elevated, with effects being particularly pronounced among individuals with histories of mental illness. Through qualitative interviews, the researchers identified two primary mechanisms explaining the distress: inactivity that intensified the stress of incarceration, and extreme conditions that produced feelings of dehumanization and humiliation. The study's regression analyses revealed that controlling for material deprivation, social detachment, and institutional distrust explained most of the association between SC and psychological distress, providing empirical support for legal arguments that SC threatens human dignity and violates constitutional protections against cruel and unusual punishment.

[15] Haney, C. (2018). The psychological effects of solitary confinement: A systematic critique. *Crime and Justice, 47*(1), 365-416. https://doi.org/10.1086/696041

[16] Reference entry: Arrigo, B. A., & Bullock, J. L. (2008). The psychological effects of solitary confinement on prisoners in supermax units: Reviewing what we know and recommending what should change. *International Journal of Offender Therapy and Comparative Criminology, 52*(6), 622-640. https://doi.org/10.1177/0306624X07309720

[17] Haney, C. (2003). Mental health issues in long-term solitary and "supermax" confinement. *Crime & Delinquency*, *49*(1), 124-156. https://doi.org/10.1177/0011128702239239

[18] Hagan, B. O., Wang, E. A., Aminawung, J. A., Albizu-Garcia, C. E., Zaller, N., Nyamu, S., Shavit, S., Deluca, J., & Fox, A. D. (2018). History of solitary confinement is associated with post-traumatic stress disorder symptoms among individuals recently released from prison. *Journal of Urban Health*, *95*(2), 141-148. https://doi.org/10.1007/s11524-017-0138-1

[19] Western, B., Simes, J. T., & Bradner, K. (2022). Solitary confinement and institutional harm. *Incarceration*, *3*(1), 26326663211065644.

Perhaps the strongest indication of the devastating effects of prolonged segregation is the robustness of the research findings regarding SC and suicidal behaviors.[20, 21, 22] Suicide is a top cause of death in carceral institutions, often by hanging or self-strangulation.[23] Incarcerated individuals are a high-risk group for suicide to begin with, and national data suggest suicide rates in carceral settings are on the rise (up by 85% from 2011-2018).[24] Preliminary 2019 data[25] suggests an ongoing crisis, with suicides constituting approximately 8% of all state prison deaths. Virtually all studies have found that placement in SC even further heightens this risk.[26] For example, inmates punished by SC were approximately 7 times as likely to self-harm, even when controlling for diagnosis and age.[27]

Suicide prevention in these settings is profoundly more challenging than community-based or even inpatient psychiatric settings due to the relationship dynamics between incarcerated persons and the staff who interact with them. In a meeting on the *Impact of Incarceration on Health* hosted by the Institute of Medicine and the National Research Council, this was referred to as "stereotyping and cynicism that results in distrust."[28]

Specific policies in some carceral settings directly disrupt medical care by requiring that correctional officers be present during interviews and exams, requiring that individuals pay the equivalent of up to 25 hours of labor to schedule an appointment, and by constraining available treatment options through prison regulations and drug formularies.[29] Overall distrust in the system

---

[20] Reiter, K., Ventura, J., Lovell, D., Augustine, D., Barragan, M., Blair, T., Chesnut, K., Dashtgard, P., Gonzalez, G., Pifer, N., & Strong, J. (2020). Psychological distress in solitary confinement: Symptoms, severity, and prevalence in the United States, 2017-2018. *American Journal of Public Health*, *110*(S1), S56-S62. https://doi.org/10.2105/AJPH.2019.305375

[21] Luigi, M., Dellazizzo, L., Giguère, C. É., Goulet, M. H., & Dumais, A. (2020). Shedding light on "the hole": A systematic review and meta-analysis on adverse psychological effects and mortality following solitary confinement in correctional settings. *Frontiers in Psychiatry*, *11*, 840. https://doi.org/10.3389/fpsyt.2020.00840

[22] Wildeman, C., & Andersen, L. H. (2020). Solitary confinement placement and post-release mortality risk among formerly incarcerated individuals: A population-based study. *The Lancet Public Health*, *5*(2), e107-e113. https://doi.org/10.1016/S2468-2667(19)30271-3

[23] Fazel, S., Ramesh, T., & Hawton, K. (2017). Suicide in prisons: An international study of prevalence and contributory factors. *The Lancet Psychiatry, 4*(12), 946-952. https://doi.org/10.1016/S2215-0366(17)30430-3

[24] Carson, E. A. (2021). *Mortality in state and federal prisons, 2001-2018 - Statistical tables* (NCJ 256002). Bureau of Justice Statistics. https://bjs.ojp.gov/content/pub/pdf/msfp0118st.pdf

[25] Carson, E. A. (2021). *Mortality in state and federal prisons, 2001-2019 - Statistical tables* (NCJ 300953). Bureau of Justice Statistics. https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf

[26] Haney, C. (2018). Restricting the use of solitary confinement. *Annual Review of Criminology*, *1*, 285-310. https://doi.org/10.1146/annurev-criminol-032317-092326

[27] Kaba, F., Lewis, A., Glowa-Kollisch, S., Hadler, J., Lee, D., Alper, H., Selling, D., MacDonald, R., Solimo, A., Parsons, A., & Venters, H. (2014). Solitary confinement and risk of self-harm among jail inmates. *American Journal of Public Health*, *104*(3), 442-447. https://doi.org/10.2105/AJPH.2013.301742

[28] Institute of Medicine & National Research Council. (2013). *Impact of Incarceration on Health.* In *Health and Incarceration: A Workshop Summary* (Chapter 1, pp. 7–14). Washington, DC: National Academies Press. https://doi.org/10.17226/18372

[29] Vandergrift, L. A., & Christopher, P. P. (2021). Do prisoners trust the healthcare system?. *Health & justice*, *9*(1), 15. https://doi.org/10.1186/s40352-021-00141-x

and of staff and undeniable logistical barriers to care can decrease help-seeking by incarcerated persons,[30] which drastically impedes suicidal prevention and the overall wellbeing of inmates.

## VI. INDIVIDUALS WITH MENTAL ILLNESS ARE PARTICULARLY VULNERABLE TO SERIOUS HARMS OF SOLITARY CONFINEMENT

Individuals with mental health needs are overrepresented in the U.S. carceral system. Although data collection practices have varied and diagnostic criteria have changed over the years, even the most conservative estimates consistently indicate that the prevalence of mental illness and past substance misuse in correctional settings far exceeds that of the general population.[31, 32] This finding aligns with the growing recognition that more individuals with mental illness are detained in U.S. prisons than in the country's inpatient psychiatric facilities.[33, 34, 35]

The use of SC among individuals with serious mental illness (SMI) is a deeply concerning pattern that perpetuates a cycle of mental health deterioration. The term "SMI" is widely used in carceral settings to identify individuals with significant mental health needs and inform decisions about the nature of treatment and its intensity, housing, and other interventions. SMI, as defined by the National Institute of Mental Health,[36] refers to a subset of individuals with mental illness who experience severe functional impairment that substantially interferes with major life activities. The American Correctional Association provides a similar definition specific to correctional facilities:

> "psychotic disorders, bipolar disorders, and major depressive disorder, and *any other diagnosed mental disorder* (excluding substance use disorder) currently associated with serious impairment in psychological, cognitive, or behavioral functioning that substantially interferes with the person's ability to meet the ordinary demands of living."[37]

---

[30] Solbakken, L. E., Bergvik, S., & Wynn, R. (2024). Breaking down barriers to mental healthcare access in prison: a qualitative interview study with incarcerated males in Norway. *BMC psychiatry*, *24*(1), 292. https://doi.org/10.1186/s12888-024-05736-w

[31] Bronson, J., & Berzofsky, M. (2017). Indicators of mental health problems reported by prisoners and jail inmates, 2011-12. *Bureau of Justice Statistics,* 1-16. https://www.bjs.gov/content/pub/pdf/imhprpji1112.pdf

[32] Fazel, S., Yoon, I. A., & Hayes, A. J. (2016). Substance use disorders in prisoners: An updated systematic review and meta-regression analysis in recently incarcerated men and women. *Addiction, 112*(10), 1725-1739. https://doi.org/10.1111/add.13877

[33] Torrey, E. F., Kennard, A. D., Eslinger, D., Lamb, R., & Pavle, J. (2010). *More mentally ill persons are in jails and prisons than hospitals: A survey of the states*. Treatment Advocacy Center. https://www.treatmentadvocacycenter.org/storage/documents/final_jails_v_hospitals_study.pdf

[34] Al-Rousan, T., Rubenstein, L., Sieleni, B., Deol, H., & Wallace, R. B. (2017). Inside the nation's largest mental health institution: A prevalence study in a state prison system. *BMC Public Health*, *17*(1), 342. https://doi.org/10.1186/s12889-017-4257-0

[35] Torrey, E. F., Zdanowicz, M. T., Kennard, A. D., Lamb, H. R., Eslinger, D. F., Biasotti, M. C., & Fuller, D. A. (2014). *The treatment of persons with mental illness in prisons and jails: A state survey*. Treatment Advocacy Center. https://www.treatmentadvocacycenter.org/storage/documents/treatment-behind-bars/treatment-behind-bars.pdf

[36] National Institute of Mental Health. (n.d.). Mental illness. Retrieved May 28, 2025, from https://www.nimh.nih.gov/health/statistics/mental-illness

[37] American Correctional Association (2016). *Restrictive Housing Standards*. https://www.wsj.com/public/resources/documents/Restrictive_housing.pdf

However, this definition is quite broad: technically, any condition aside from substance abuse can qualify as *serious,* at least according to the NIMH and ACA definitions. A recent systematic review[38] found that even researchers do not seem to clarify or standardize the SMI label. In their review, the researchers found that 85% of randomized controlled trials (the "gold-standard" in clinical research) using the term SMI provided no definition at all, and among those that did, there was substantial variability in the diagnostic criteria and functional impairment thresholds used to classify individuals as having SMI. Inconsistencies such as these raise important questions about which mental health conditions are included under the SMI label and which conditions are not. A narrow focus on a few specific diagnoses (e.g., schizophrenia and bipolar disorder) may overlook the severity and impact of other mental health conditions.

For example, anorexia nervosa has the highest mortality rate of any psychiatric disorder, with an estimated 10% of individuals with anorexia dying within 10 years of diagnosis.[39] Similarly, borderline personality disorder is associated with a suicide rate of up to 10%.[40] PTSD is another condition that can cause severe functional impairment and is associated with increased risk of suicide.[41] Findings such as these show evidence of human suffering—but these conditions often do not seem "serious" enough.

The inconsistent and potentially problematic nature of the SMI construct is particularly concerning in carceral facilities, where the label can bring opportunities for individuals' housing, privileges, and access to programming. The unique environment of incarceration, with its structured routines and limited opportunities, may also complicate the assessment of an individual's ability to meet "ordinary demands of living," potentially leading to over- or under-identification of SMI.

Numerous studies have shown that individuals with mental illness accompanied by functional impairment (regardless of whether they are assigned the "SMI" label or not) are not only more likely to be placed in such units but also tend to spend longer periods in RH compared to those without.[42] This troubling trend suggests a vicious cycle in which pre-existing mental health problems increase the likelihood of SC placement, which then exacerbates or precipitates new mental health issues. The psychological impact of prolonged RH, characterized by sensory deprivation, lack of meaningful social interaction, and extreme idleness, can be devastating for individuals already struggling with mental health challenges. For individuals who have difficulty

---

[38] Gonzales, L., Kois, L. E., Chen, C., López-Aybar, L., McCullough, B., & McLaughlin, K. J. (2022). Reliability of the term "Serious Mental Illness": A systematic review. *Psychiatric Services.* https://doi.org/10.1176/appi.ps.202100661

[39] Arcelus, J., Mitchell, A. J., Wales, J., & Nielsen, S. (2011). Mortality rates in patients with anorexia nervosa and other eating disorders: A meta-analysis of 36 studies. *Archives of General Psychiatry, 68*(7), 724-731. https://doi.org/10.1001/archgenpsychiatry.2011.74

[40] Zaheer, J., Links, P. S., & Liu, E. (2008). Assessment and emergency management of suicidality in personality disorders. Psychiatric Clinics of North America, 31(3), 527-543. https://doi.org/10.1016/j.psc.2008.03.007

[41] Houlahan, T., Cox, B. J., & Asmundson, G. J. G. (2005). Anxiety disorders associated with suicidal ideation and suicide attempts in the National Comorbidity Survey. *The Journal of Nervous and Mental Disease, 193*(7), 450-454. https://doi.org/10.1097/01.nmd.0000168263.89652.6b

[42] Dellazizzo, L., Luigi, M., Giguère, C. É., Goulet, M. H., & Dumais, A. (2020). Is mental illness associated with placement into solitary confinement in correctional settings? A systematic review and meta-analysis. *International Journal of Mental Health Nursing*, *29*(4), 576–589. https://doi.org/10.1111/inm.12733

with emotion regulation, impulse control, and reality testing, the added stress of SC can rapidly accelerate mental health decline. Inadequate mental health treatment and support in RH settings further compounds the problem, also contributing to a self-reinforcing cycle of deterioration. In addition, RH often serves to further marginalize and stigmatize individuals, reinforcing patterns of institutional neglect and abuse, rather than addressing the underlying mental health needs that may contribute to behavioral infractions.

Furthermore, the very nature of some mental illnesses (e.g., characteristic suspiciousness of paranoid schizophrenia or PTSD) amplifies institutional mistrust many incarcerated persons suspect of administrators, correctional officers, and even medical and mental health providers working in detention facilities. This reinforces substantial barriers to healthcare access and utilization that are already well-documented in jails and prisons.

## VII. TRAUMATIC BRAIN INJURY AND HEIGHTENED RISK OF SERIOUS HARM

Traumatic Brain Injury (TBI) is increasingly recognized as a pervasive public health issue, with an estimated 2.8 million individuals in the United States sustaining a TBI annually.[43] TBI is defined as an acquired brain injury[44] caused by an external physical force, leading to total or partial functional disability or psychosocial impairment.[45] Not all head impacts are considered TBIs. Symptoms must be present and vary depending on the location and severity of impact. Symptoms are wide-ranging and may include attention deficits, memory loss, headaches, increased aggression, impulsivity, and an increased likelihood of developing other mental disorders**.** Falls are the most frequent cause of TBI.[46]

Substantial alterations in behavior and personality following a head injury should be considered a serious warning sign that warrants further evaluation. While some changes in mood and behavior are common and expected in the acute phase after a TBI, persistent or drastic shifts in personality may indicate more extensive damage. For example, an individual who was previously calm and even-tempered may suddenly exhibit uncharacteristic aggression, impulsivity, or emotional lability. They may struggle with social interactions, display poor judgment, or engage in risky behaviors that deviate significantly from their pre-injury conduct. Personality changes can be

---

[43] Centers for Disease Control and Prevention. (2022). *Traumatic Brain Injury & Concussion*. https://www.cdc.gov/traumaticbraininjury/data/index.html

[44] Acquired brain injury refers to any damage to the brain that occurs after birth due to external factors such as trauma, stroke, infection, or lack of oxygen, while organic brain injury typically refers to brain damage caused by internal biological processes like degenerative diseases, genetic disorders, or developmental abnormalities. The key distinction is that acquired injuries result from external events or circumstances that happen to an otherwise normally developing brain, whereas organic injuries stem from inherent biological or pathological processes within the brain itself.

[45] Corrigan, J. D., et al. (2018). *The epidemiology of traumatic brain injury*. In *Traumatic Brain Injury* (pp. 45–70). Springer.

[46] American Brain Foundation. (n.d.). Common causes of brain injury and how research is helping to detect and treat TBI. https://www.americanbrainfoundation.org/common-causes-of-brain-injury-and-how-research-is-helping-detect-and-treat-tbi/#:~:text=The%20most%20common%20causes%20of%20traumatic%20brain,to%20nearly%20half%20of%20all%20TBI%2Drelated%20hospitalizations

particularly concerning if they interfere with daily functioning, strain interpersonal relationships, or lead to unsafe situations. Mental health problems can be exacerbated or caused by TBI.

Overall, TBI prevalence among incarcerated populations is alarmingly high, with meta-analyses estimating lifetime prevalence rates of 50% for any TBI and 32% for moderate-to-severe TBI.[47] Within the PA DOC, researchers have found that 75% of individuals leaving maximum security at SCI Graterford reported a TBI history, and 74% of those individuals had significant cognitive impairments that could increase their recidivism likelihood.[48] In the same study, individuals who received NeuroResource Facilitation treatment for TBI had a recidivism rate of only 17% during the follow-up period, suggesting that targeted brain injury interventions may significantly reduce reoffending. These rates of TBI far exceed those observed in the general population, underscoring the disproportionate burden of TBI within the criminal legal system at large, as well as high-risk populations within the PA DOC.

A growing body of research suggests individuals with TBI likely exhibit higher rates of contact with the criminal legal system due to volitional and cognitive symptoms that increase risk-taking behaviors.[49, 50] Individuals with frontal lobe injuries[51] are more likely to engage in risk-taking and impulsive behavior. TBI symptoms such as irritability, anger, aggression, slowed responses, or impulsive behavior may persist long after the initial injury[52] and be misinterpreted as uncooperative or defiant. In a large study of over 17,000 incarcerated persons spanning 11.5 years, men with TBI were more likely to have infractions (1.32 times more likely), violent infractions (1.86 times more likely), and non-violent infractions (1.19 times more likely) than men without TBI.[53] Disciplinary action may become routine, further exacerbating the challenges faced by those with TBI. The failure to recognize and address the unique needs of this population can perpetuate

---

47 Hunter, S., Kois, L. E., Peck, A. T., Elbogen, E. B., & LaDuke, C. (2023). The prevalence of traumatic brain injury (TBI) among people impacted by the criminal legal system: An updated meta-analysis and subgroup analyses. *Law and Human Behavior, 47*(5), 539-565. https://doi.org/10.1037/lhb0000543

48 Nagele, D., Vaccaro, M., Schmidt, M. J., & Keating, D. (2018). Brain injury in an offender population: Implications for reentry and community transition. *Journal of Offender Rehabilitation, 57*(8), 562-585.

49 Williams, W. H., Chitsabesan, P., Fazel, S., McMillan, T., Hughes, N., Parsonage, M., & Tonks, J. (2018). Traumatic brain injury: a potential cause of violent crime?. *The Lancet Psychiatry*, *5*(10), 836–844. https://doi.org/10.1016/S2215-0366(18)30062-2

50 Floden, D., Alexander, M. P., Kubu, C. S., Katz, D., & Stuss, D. T. (2008). Impulsivity and risk-taking behavior in focal frontal lobe lesions. *Neuropsychologia*, *46*(1), 213-223.

51 A frontal lobe injury occurs when damage to the front portion of the brain disrupts the area responsible for executive functions such as decision-making, impulse control, personality regulation, and motor planning. Such injuries can result in significant changes to behavior, emotional regulation, and cognitive abilities, often affecting a person's ability to organize thoughts, control impulses, or maintain their previous personality characteristics.

52 Rao, V., Rosenberg, P., Bertrand, M., Salehinia, S., Spiro, J., Vaishnavi, S., Rastogi, P., Noll, K., Schretlen, D. J., Brandt, J., Cornwell, E., Makley, M., & Miles, Q. S. (2009). Aggression after traumatic brain injury: Prevalence and correlates. *The Journal of Neuropsychiatry and Clinical Neurosciences*, 21(4), 420-429. https://doi.org/10.1176/jnp.2009.21.4.420

53 Shiroma, E.J., Pickelsimer, E.E., Ferguson, P.L., et al. (2010). Association of medically attended traumatic brain injury and in-prison behavioral infractions: A statewide longitudinal study. *Journal of Correctional Health Care*, 16(4), 273-286.

a cycle of problematic behavior and poor treatment engagement, ultimately hindering effective rehabilitation efforts.[54, 55, 56]

The relationship between SC and TBI has emerged as a critical area of concern in recent years. Individuals with increasingly severe and repeat infractions will be more likely to face more severe restrictions, and for longer periods of time. It follows that the 50% and upwards of incarcerated persons with TBI are at a substantially increased likelihood to enter SC. Once in isolation, those with TBI may struggle to adapt due to their cognitive and emotional deficits. Accumulating research suggests that individuals with a history of TBI may be particularly vulnerable to the adverse effects of SC, and that the practice itself may exacerbate or even cause neurological damage. Sensory deprivation, lack of cognitive stimulation, and chronic stress associated with isolation may profoundly affect brain structure and function, particularly for those with pre-existing neurological vulnerabilities such as TBI.[57]

## VIII. POSTTRAUMATIC STRESS DISORDER AND HEIGHTENED RISK OF SERIOUS HARM

As noted previously, Plaintiff Tucker was diagnosed with PTSD with Dissociative Symptoms by PA DOC mental health providers in 2019. PTSD is a mental health condition that can develop following exposure to a traumatic event, such as a natural disaster, serious accident, terrorist act, war/combat, or violent personal assault.[58] The core features of PTSD include intrusive symptoms, avoidance of trauma-related stimuli, negative alterations in cognition and mood, and marked changes in arousal and reactivity. Intrusive symptoms may present as recurrent, involuntary, and distressing memories of the traumatic event, as well as nightmares, flashbacks, and intense psychological or physiological reactions to reminders of the trauma. Individuals with PTSD often attempt to avoid thoughts, feelings, or external reminders associated with the traumatic event, which can lead to emotional numbing, detachment from others, and a loss of interest in previously enjoyed activities. Negative alterations in cognition and mood are common in PTSD and may include persistent negative beliefs about oneself, others, or the world; distorted blame of self or others for the traumatic event; and a pervasive negative emotional state. These cognitive and emotional changes can contribute to feelings of alienation, difficulty experiencing positive emotions, and impaired social functioning. Individuals with PTSD also experience marked

---

[54] Davidson, M., & Reed, K. (2024). Mind matters: Building a justice system that is inclusive and responsive to brain injury. The Council of State Governments Justice Center. https://csgjusticecenter.org/publications/mind-matters-building-a-justice-system-that-is-inclusive-and-responsive-to-brain-injury/

[55] Chan, V., Estrella, M. J., Syed, S., Lopez, A., Shah, R., Colclough, Z., Babineau, J., Beaulieu-Dearman, Z., & Colantonio, A. (2023). Rehabilitation among individuals with traumatic brain injury who intersect with the criminal justice system: A scoping review. *Frontiers in Neurology*, *13*, 1052294. https://doi.org/10.3389/fneur.2022.1052294

[56] Williams, W. H., Chitsabesan, P., Fazel, S., McMillan, T., Hughes, N., Parsonage, M., & Tonks, J. (2018). Traumatic brain injury: a potential cause of violent crime?. *The Lancet Psychiatry*, *5*(10), 836–844. https://doi.org/10.1016/S2215-0366(18)30062-2

[57] Frasca, D., Tomaszczyk, J., McFadyen, B. J., & Green, R. E. (2013). Traumatic brain injury and post-acute decline: what role does environmental enrichment play? A scoping review. *Frontiers in Human Neuroscience, 7,* 31. https://doi.org/10.3389/fnhum.2013.00031

[58] American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.). https://doi.org/10.1176/appi.books.9780890425787

alterations in arousal and reactivity, such as irritability, angry outbursts, reckless or self-destructive behavior, hypervigilance, exaggerated startle response, and sleep disturbances. These symptoms can lead to significant distress and impairment in social, occupational, and other important areas of functioning. The development and maintenance of PTSD is influenced by a complex interplay of biological, psychological, and social factors. Key risk factors include the severity and duration of the traumatic event, prior trauma exposure, lack of social support, and pre-existing mental health conditions.[59]

The development of Complex PTSD (CPTSD), a variant of PTSD, can emerge from prolonged, repeated trauma, often of an interpersonal nature, such as childhood abuse, chronic neglect, domestic violence, or captivity.[60] Unlike "traditional" PTSD, which can result from a single traumatic event, CPTSD is usually associated with chronic trauma that occurs over an extended period.[61] Several factors influence the development of CPTSD, including the nature of the trauma, age of onset, duration and severity, and lack of support. Interpersonal trauma, especially when it involves a betrayal of trust or a violation of personal boundaries, is more likely to result in CPTSD.[62] Traumatic experiences during childhood, when the brain is still developing, can have a profound impact on an individual's psychological and neurobiological development, increasing the risk of trauma-related disorders.[63] Prolonged exposure to trauma, especially when it is severe or life-threatening, can overwhelm an individual's coping mechanisms and lead to CPTSD.[64] Moreover, the absence of a supportive environment or relationships can exacerbate the impact of trauma and contribute to the development of CPTSD.[65]

Individuals with CPTSD often experience a range of symptoms that extend beyond the typical PTSD symptoms of re-experiencing, avoidance, and hyperarousal.[66] These additional symptoms may include affect dysregulation, negative self-concept, interpersonal disturbances, somatization, and dissociation.[67] Affect dysregulation refers to difficulty managing emotions, including intense

---

[59] Brewin, C. R., Andrews, B., & Valentine, J. D. (2000). Meta-analysis of risk factors for posttraumatic stress disorder in trauma-exposed adults. *Journal of Consulting and Clinical Psychology, 68*(5), 748-766. https://doi.org/10.1037/0022-006X.68.5.748

[60] Hyland, P., Shevlin, M., Elklit, A., Murphy, J., Vallières, F., Garvert, D. W., & Cloitre, M. (2017). An assessment of the construct validity of the ICD-11 proposal for complex posttraumatic stress disorder. *Psychological Trauma: Theory, Research, Practice, and Policy, 9*(1), 1-9. https://doi.org/10.1037/tra0000114

[61] Herman, J. L. (1992). Complex PTSD: A syndrome in survivors of prolonged and repeated trauma. *Journal of Traumatic Stress, 5*(3), 377-391. https://doi.org/10.1002/jts.2490050305

[62] Ford, J. D., & Courtois, C. A. (2014). Complex PTSD, affect dysregulation, and borderline personality disorder. *Borderline personality disorder and emotion dysregulation*, *1*(1), 9.

[63] van der Kolk, B. A. (2017). Developmental Trauma Disorder: Toward a rational diagnosis for children with complex trauma histories. *Psychiatric Annals, 35*(5), 401-408. https://doi.org/10.3928/00485713-20050501-06

[64] Cloitre, M., Hyland, P., Bisson, J. I., Brewin, C. R., Roberts, N. P., Karatzias, T., & Shevlin, M. (2019). ICD-11 Posttraumatic Stress Disorder and Complex Posttraumatic Stress Disorder in the United States: A population-based study. *Journal of Traumatic Stress, 32*(6), 833-842. https://doi.org/10.1002/jts.22454

[65] Courtois, C. A., & Ford, J. D. (2013). *Treatment of complex trauma: A sequenced, relationship-based approach*. Guilford Press.

[66] Karatzias, T., Shevlin, M., Fyvie, C., Hyland, P., Efthymiadou, E., Wilson, D., Roberts, N., Bisson, J. I., Brewin, C. R., & Cloitre, M. (2017). Evidence of distinct profiles of Posttraumatic Stress Disorder (PTSD) and Complex Posttraumatic Stress Disorder (CPTSD) based on the new ICD-11 Trauma Questionnaire (ICD-TQ). *Journal of Affective Disorders, 207,* 181-187. https://doi.org/10.1016/j.jad.2016.09.032

[67] Cloitre et al. (2019).

anger, depression, or emotional numbness. Negative self-concept involves feelings of shame, guilt, or worthlessness, and a belief that one is fundamentally flawed or damaged. Interpersonal disturbances include difficulty forming and maintaining healthy relationships, suspiciousness and trust issues, and a tendency to avoid or engage in unstable relationships. Somatization refers to physical symptoms without a clear medical cause, such as chronic pain, headaches, or digestive issues. Dissociation involves feeling detached from one's thoughts, emotions, or body, or experiencing depersonalization or derealization.

PTSD is alarmingly prevalent in carceral settings. Research consistently shows individuals in prisons and jails experience PTSD at rates significantly higher than the general population. For example, a recent study found that men entering jail were 3.5 times more likely to meet PTSD criteria compared to men in the community.[68] An international meta-analysis[69] estimated that 6% of male and 21% of female prisoners worldwide met diagnostic criteria for PTSD. These figures are substantially higher than the lifetime prevalence of 4% for men and 10% for women in the general U.S. population.

While research on CPTSD in prisons is still emerging, early findings suggest it is also overrepresented in these populations. A study of men incarcerated in United Kingdom prisons found that approximately 25% met criteria for PTSD, and an additional 15% met criteria for CPTSD.[70] These stark disparities underscore the pervasiveness of trauma exposure and subsequent psychological distress among those who are incarcerated. Some estimates suggest that up to 90% of inmates have experienced at least one traumatic event prior to incarceration. Once incarcerated, they may face additional traumatic stressors such as physical and sexual assault, SC, and the chronic stress of the prison environment itself.

The relationship between SC and pre-existing PTSD is complex and may be cyclical. Individuals with PTSD are more likely to be placed in SC compared to those without mental health problems.[71] Numerous studies have established that prolonged SC can exacerbate symptoms of PTSD, leading to increased hypervigilance, intrusive thoughts, and emotional dysregulation. A key factor in understanding this relationship is the concept of "re-traumatization." For individuals with pre-existing PTSD, the conditions of SC—including lack of social interaction, sensory deprivation, and loss of autonomy—can mirror the dynamics of past traumatic experiences, triggering a resurgence of symptoms. The isolation and lack of control inherent in SC can also interfere with an individual's ability to utilize adaptive coping strategies, such as seeking social support or engaging in physical activity, further compounding their psychological distress. Moreover, the unpredictable nature of SC (and particularly AC, with individuals often unaware of how long they

---

[68] Wolff, N., & Shi, J. (2012). Childhood and adult trauma experiences of incarcerated persons and their relationship to adult behavioral health problems and treatment. *International Journal of Environmental Research and Public Health, 9*(5), 1908-1926. https://doi.org/10.3390/ijerph9051908

[69] Baranyi, G., Cassidy, M., Fazel, S., Priebe, S., & Mundt, A. P. (2018). Prevalence of posttraumatic stress disorder in prisoners. *Epidemiologic Reviews*, *40*(1), 134-145. https://doi.org/10.1093/epirev/mxx015

[70] Facer-Irwin, E., Karatzias, T., Bird, A., Blackwood, N., & MacManus, D. (2022). PTSD and complex PTSD in sentenced male prisoners in the UK: Prevalence, trauma antecedents, and psychiatric comorbidities. *Psychological Medicine*, *52*(13), 2794-2804.

[71] Chadick, C. D., Batastini, A. B., Levulis, S. J., & Morgan, R. D. (2018). The psychological impact of solitary confinement: A systematic literature review. *International Journal of Offender Therapy and Comparative Criminology, 62*(10), 3212-3228. https://doi.org/10.1177/0306624X17741581

will be in RH) can contribute to a persistent state of anxiety, uncertainty, and hyperarousal. This chronic stress response has been shown to have deleterious effects on both mental and physical health, potentially leading to long-term consequences that persist even after release from solitary. For those with pre-existing PTSD, this prolonged activation of the stress response system can not only impede the recovery process, but significantly exacerbate it.

## IX. SOLITARY CONFINEMENT IN THE CONTEXT OF CO-OCCURRING TBI and PTSD

TBI and PTSD frequently co-occur due to the nature of the events that can cause these conditions. For example, a meta-analysis found that individuals with a history of TBI had a significantly higher prevalence of PTSD compared to those without TBI.[72] Similarly, military service members who sustained a TBI during deployment were more likely to develop PTSD than those who did not experience a TBI.[73] Another study found that 73% of incarcerated individuals with TBI also met criteria for PTSD.[74]

Several factors may contribute to the increased risk of developing PTSD following a TBI. The experience of a TBI itself can be psychologically traumatic, as it often involves a sudden, unexpected, and potentially life-threatening event. Traumatic experiences, such as combat, physical assault, motor vehicle accidents, and explosive blasts, often involve both psychological trauma and physical injury to the brain. The cognitive and emotional changes that can result from a TBI, such as memory impairment, difficulty with emotion regulation, and increased irritability, may make individuals more vulnerable to developing PTSD symptoms.[75] Moreover, the neurobiological changes associated with TBI may also play a role in the development of PTSD. TBI can cause structural and functional alterations in brain regions involved in the stress response and emotion processing, such as the amygdala, hippocampus, and prefrontal cortex.[76] These changes may lead to a heightened threat sensitivity and a reduced capacity to regulate emotional responses, which are key features of PTSD.[77] The cognitive, emotional, and behavioral sequelae of the two may increase distress, maladaptive coping, and the potential for disciplinary actions such as SC. Take, as examples, the following case example:

---

[72] Carlson, K. F., Kehle, S. M., Meis, L. A., Greer, N., MacDonald, R., Rutks, I., Sayer, N. A., Dobscha, S. K., & Wilt, T. J. (2011). Prevalence, assessment, and treatment of mild traumatic brain injury and posttraumatic stress disorder: A systematic review of the evidence. *The Journal of Head Trauma Rehabilitation*, *26*(2), 103-115. https://doi.org/10.1097/HTR.0b013e3181e50ef1

[73] Hoge, C. W., McGurk, D., Thomas, J. L., Cox, A. L., Engel, C. C., & Castro, C. A. (2008). Mild traumatic brain injury in U.S. soldiers returning from Iraq. *The New England Journal of Medicine*, *358*(5), 453-463. https://doi.org/10.1056/NEJMoa072972

[74] Pérez-García, G., Barrón, R. G. R., Pérez-García, A., & Santiago-Molina, E. (2017). Traumatic brain injury and posttraumatic stress disorder in inmates of a high security prison in Mexico. *Revista Española de Sanidad Penitenciaria, 19*(3), 76-83.

[75] Bryant, R. A. (2011). Post-traumatic stress disorder vs traumatic brain injury. *Dialogues in Clinical Neuroscience*, *13*(3), 251-262. https://doi.org/10.31887/DCNS.2011.13.2/rbryant

[76] Shenton, M. E., Hamoda, H. M., Schneiderman, J. S., Bouix, S., Pasternak, O., Rathi, Y., Vu, M.-A., Purohit, M. P., Helmer, K., Koerte, I., Lin, A. P., Westin, C.-F., Kikinis, R., Kubicki, M., Stern, R. A., & Zafonte, R. (2012). A review of magnetic resonance imaging and diffusion tensor imaging findings in mild traumatic brain injury. *Brain Imaging and Behavior*, *6*(2), 137-192. https://doi.org/10.1007/s11682-012-9156-5

[77] Hoffman, S. W., & Harrison, C. (2009). The interaction between psychological health and traumatic brain injury: A neuroscience perspective. *Clinical Neuropsychologist*, *23*(8), 1400-1415. https://doi.org/10.1080/13854040903369433

> An incarcerated individual has pre-existing TBI and PTSD from childhood and adult traumas. His hypervigilance makes him constantly scan for threats, and TBI has damaged his ability to accurately assess social situations. He constantly suspects others are working against him and will not engage with others, including mental health staff, in a misguided effort to "self-protect." Because he perceives others as threatening and his TBI-judgment prompts him to "strike first" before thinking, he is involved in frequent assaults and accumulates serious infractions. He is placed in SC, where the isolation feeds paranoia and further mistrust. Without normal social interaction to reality-test his suspicious worldview, his paranoia and distress intensifies, setting the stage for ongoing infractions and declining mental and cognitive functioning.

SC itself can be a traumatic event leading to PTSD symptoms. Moreover, the effects of SC may be particularly severe for individuals with TBI and PTSD due to the neurobiological vulnerabilities associated with these conditions. TBI can disrupt the functioning of brain regions involved in stress reactivity and coping, such as the prefrontal cortex and hippocampus.[78] PTSD is associated with dysregulation of the hypothalamic-pituitary-adrenal (HPA) axis and increased sensitivity to stress.[79,80] The chronic stress of SC may further compromise these already vulnerable neural systems, leading to more severe and persistent psychological harm.

As such, the relationship between SC and co-occurring TBI and PTSD is complex and bidirectional. Pre-existing TBI and PTSD can increase the risk of placement in SC, while the isolation and deprivation of segregation can exacerbate the symptoms of these conditions and cause additional psychological harm. Given the high prevalence of TBI and PTSD among incarcerated populations, it is crucial for carceral systems to consider these vulnerabilities when making housing decisions and to provide appropriate mental health treatment and support.

## X. STRATEGIES TO MITIGATE SERIOUS HARM OF SOLITARY CONFINEMENT FOR INDIVIDUALS WITH PTSD AND TBI

The intersection of TBI, PTSD, and SC is a critical area of concern, as these conditions create a compounding effect that significantly increases the risk of serious psychological harm. The literature consistently demonstrates that individuals with TBI and PTSD are particularly vulnerable to the devastating effects of isolation, necessitating specialized approaches to prevent further deterioration and promote recovery. Trauma-informed care in carceral settings should practice comprehensive consideration of TBI and PTSD across assessment, placement, treatment planning, and suicide risk management. By recognizing the prevalence and impact of these conditions among incarcerated individuals, facilities can provide more effective, targeted interventions that promote rehabilitation, reduce recidivism, and enhance the overall well-being of incarcerated populations.

[78] Moreno-López, L., Sahakian, B. J., Sankoh, A. J., Devine, O. P., Stancil, S. L., & Rowe, J. B. (2020). Structural and functional brain changes in posttraumatic stress disorder and traumatic brain injury. *Biological Psychiatry*, *88*(11), 861-875. https://doi.org/10.1016/j.biopsych.2020.06.010

[79] Sherin, J. E., & Nemeroff, C. B. (2011). Post-traumatic stress disorder: The neurobiological impact of psychological trauma. *Dialogues in Clinical Neuroscience*, *13*(3), 263-278. https://doi.org/10.31887/DCNS.2011.13.2/jsherin

[80] Yehuda, R. (2002). Post-traumatic stress disorder. *New England Journal of Medicine*, *346*(2), 108-114. https://doi.org/10.1056/NEJMra012941

**Risk-Need-Responsivity: The Dominant Paradigm in Modern Carceral Programs**

The Risk-Need-Responsivity (RNR) model[81] is considered the gold standard for effective intervention with individuals in the criminal legal system. It is an evidence-based framework for matching treatment intensity to recidivism level (risk), addressing criminogenic needs[82] (need), and tailoring interventions to individual characteristics and learning styles (responsivity). The responsivity principle is further broken down into two components: general responsivity, referring to the use of interventions that are generally affective with groups of individuals; and specific responsivity, which refers to the tailoring of interventions to take into consideration particular client characteristics (e.g., cultural factors and mental health).

In many ways RNR parallels a medical treatment approach, but for corrections. Just as physicians give the sickest patients the most intensive treatment, RNR indicates that the highest-risk offenders receive the most intensive programming. The *risk* principle parallels medical triage: assess the patient's severity of illness, with the most critical cases getting immediate intensive care while stable patients get routine check-ups. Next, the *need* principle parallels diagnosis of a specific disease: a physician must identify and treat the medical problems causing the symptoms, whether it be diabetes, heart disease, or infection. Finally, the *responsivity* principle parallels personalized medicine: tailor the treatment to fit an individual patient's allergies, age, and additional health conditions.

Within the RNR framework, PTSD and TBI function as what researchers term "stabilization needs:" conditions that, while not directly criminogenic, create barriers to effective interventions. The neurobiological disruptions caused by PTSD and TBI would make it difficult to meaningfully engage in carceral programming. Without stabilizing these barriers through trauma-informed care and neurocognitive accommodations, participants cannot meaningfully engage with evidence-based carceral programming, undermining the effectiveness of interventions specifically designed to reduce recidivism and institutional misconduct. This principle recognizes that successful rehabilitation requires a foundation of neurobiological and psychological stability before higher-order interventions can achieve their intended outcomes.

The PA DOC and the state at large has reportedly embraced RNR principles for well over a decade. In 2010, the PA DOC joined the Justice Reinvestment Initiative (JRI), aiming to reduce the state's incarcerated population, decrease recidivism, and better preserve financial resources. One JRI

---

[81] Andrews, D. A., & Bonta, J. (2010). Rehabilitating criminal justice policy and practice. *Psychology, Public Policy, and Law, 16*(1), 39–55. https://doi.org/10.1037/a0018362

[82] Criminogenic needs are risk factors that are directly linked to criminal behavior and are amenable to change through intervention. These needs represent specific areas of an individual's life that, when addressed through appropriate treatment and programming, can significantly reduce the likelihood of recidivism. The RNR model identifies several major criminogenic needs, including antisocial attitudes and beliefs, antisocial peer associations, substance abuse, family dysfunction, employment and educational deficits, and lack of prosocial recreational activities. Unlike static risk factors such as criminal history or age at first offense, criminogenic needs are modifiable characteristics that can be targeted through evidence-based interventions. The effective identification and treatment of these criminogenic needs form the cornerstone of the "Need" principle within the RNR framework, which posits that rehabilitation programs should prioritize addressing these specific risk factors to achieve optimal reductions in recidivism rates. Research consistently demonstrates that programs targeting criminogenic needs produce significantly better outcomes than those focusing on non-criminogenic factors such as self-esteem or anxiety that, while potentially important for overall well-being, do not directly correlate with criminal behavior.

review presented to PA DOC stakeholders explicitly stated that "Studies have shown that treating high-risk people with high-intensity programming dramatically decreases recidivism" while "providing very low-intensity programming to high-risk people does little, if anything, to reduce recidivism." They have adopted standardized risk assessments statewide and incorporated RNR into their sentencing practices. Just as a physician would not perform surgery on someone having a heart attack without first stabilizing their cardiac condition, the RNR model recognizes that cognitive impairments, trauma history, and neurobiological vulnerabilities significantly impact the ability to engage with standard correctional programming, so addressing these barriers (responsivity) is essential for any rehabilitation to succeed.

In Plaintiff Tucker's case, however, the PA DOC appears to have done the exact opposite of what RNR principles require. Instead of providing him with intensive, evidence-based interventions, they essentially gave him no programming at all and placed him in prolonged SC. This is like a hospital identifying a patient as critically ill and then locking them in an empty room without any treatment—the opposite of what medical protocol would require. Moreover, they failed to account for responsivity factors (brain injury and PTSD) when designing his treatment plan. RNR requires that programming be tailored to individual characteristics that affect someone's ability to engage with treatment, but SC *worsened* his cognitive and trauma symptoms, making any future rehabilitation even more difficult. This represents a violation of fundamental evidence-based carceral practices—they correctly identified him as someone needing intensive intervention, then provided the most punitive, least therapeutic environment possible.

Thus, the responsivity principle is particularly relevant when considering individuals with TBI and PTSD such as Plaintiff Tucker, as it recognizes that cognitive impairments, trauma histories, and neurobiological vulnerabilities can significantly impact an individual's ability to engage with and benefit from standard carceral programming. Rather than viewing accommodations for TBI and PTSD as providing "too much" treatment or special consideration, the RNR model supports the notion that addressing these specific factors is essential for intervention efficacy. For individuals whose cognitive deficits from TBI may impair their ability to process information or whose PTSD symptoms may interfere with their capacity to engage in therapeutic relationships, failure to address these underlying conditions represents a fundamental violation of the responsivity principle and ultimately undermines both rehabilitative goals and institutional safety.

The intersection of TBI, PTSD, and SC creates a particularly complex clinical picture that demands specialized approaches grounded in trauma-informed care and neurodiversity-sensitive practices, approaches that align seamlessly with RNR's emphasis on individualized, evidence-based intervention strategies. The following strategies are drawn from them.

**Routine Screening and Ongoing Assessment**

Effective mental health screening and brief assessments require standardized, validated tools tailored to the unique context of incarceration. Even the reliance on standardized screening tools, while providing essential structure and consistency, necessitates the incorporation of clinical override mechanisms that allow mental health professionals to consider unique factors not adequately captured by standard assessments.

These overrides become particularly crucial when evaluating individuals whose presentations may not align with typical community-based risk profiles but reflect the distinct vulnerabilities present within carceral environments. The carceral context demands that clinicians remain vigilant for risk factors that may be less common in community settings but are prevalent among incarcerated populations and strongly associated with decompensation and suicide risk.

TBI and PTSD represent prime examples of conditions that require heightened attention in these settings, despite potentially being underemphasized in community-based screening protocols. The prevalence of these conditions among incarcerated individuals far exceeds that of the general population, yet their manifestations may be masked by the complex presentations common in carceral environments. Clinical judgment must therefore supplement standardized assessments to identify individuals whose histories of head trauma or exposure to interpersonal violence place them at elevated risk for psychiatric deterioration, particularly when facing the additional stressor of potential or ongoing SC placement. Plaintiff Tucker's situation exemplifies this need for clinical override. Despite documented head trauma and neurocognitive symptoms following his 2017 fall, his heightened vulnerability to psychiatric decompensation during his time on the RRL was not adequately considered in his placement decisions.

Trauma history or a recent traumatic event is typically included in wide-ranging mental health assessments, as well as suicide risk assessments. However, trauma history is quite common—not everyone has a clinically-significant reaction to trauma initially, and it is less common for clinically-significant symptoms to endure over time. Thus, “trauma” and “PTSD” are related, but distinct concepts.

From the psychiatric decompensation and suicide risk perspectives, PTSD is a significantly more potent risk factor than trauma exposure alone. While trauma exposure can certainly contribute to psychological distress and may increase suicide risk through various pathways, the structured symptom profile of PTSD creates a particularly risky clinical picture. The intrusive re-experiencing symptoms can lead to overwhelming emotional dysregulation, while the persistent negative alterations in mood and cognition often include feelings of detachment from others, persistent negative beliefs about oneself and the world, and diminished interest in significant activities—all of which are established risk factors for suicidal ideation and behavior. The hyperarousal symptoms characteristic of PTSD, including irritability, anger outbursts, and sleep disturbances, can further compromise an individual's capacity for effective coping and problem-solving. Additionally, the avoidance symptoms may prevent individuals from seeking help or engaging in protective social connections. This is particularly concerning in carceral environments, where the prevalence of both trauma exposure and PTSD is substantially elevated compared to the general population, and where the additional stressor of SC can exacerbate these symptoms and further compromise psychological stability and suicide risk assessment.

Regarding TBI, it is important to note that *cognitive assessments* are critical for assessing the true impact of TBI, rather than relying on oversimplistic methods. Assessing a patient as "alert and oriented x 3" (A&Ox3) and performing a CT scan are insufficient for comprehensively evaluating TBI for several reasons. While this clinical shorthand indicates an individual is awake, aware of self and surroundings, and oriented to person, place, and time, it does not capture the full range of cognitive, emotional, and behavioral sequelae that can result from TBI. Similarly, CT scans are

useful for detecting acute intracranial hemorrhage, fracture, or gross structural abnormalities, but often fail to identify more subtle neurological damage that influences brain-behavior relationships. For example, one study followed TBI patients for a year post-injury and found that even those with normal CT scans reported persistent difficulties with fatigue, dizziness, and irritability.[83] Just as a building may appear structurally sound following an earthquake but requires comprehensive engineering assessment to detect cracked foundations, weakened support beams, or stress fractures that are not obvious through simple visual inspection, the brain requires specialized cognitive assessments to identify functional impairments that may not be apparent through brief clinical observation or standard neuroimaging.

The distinction between a head injury and TBI diagnosis becomes particularly important when CT scans are negative. According to *DSM-5-TR*[84] diagnostic criteria, TBI requires evidence of an impact to the head or other mechanisms of rapid movement or displacement of the brain within the skull, accompanied by at least one of the following: loss of consciousness, posttraumatic amnesia, disorientation and confusion, *or* neurological signs such as neuroimaging demonstrating injury, new onset of seizures, visual field cuts, anosmia (lost or diminished sense of smell), or hemiparesis (weakness on one side of the body). Crucially, trauma that produced *no* cognitive or neurological changes at the time of the incident cannot produce a neurocognitive disorder such as TBI under this diagnostic framework. This means a negative CT scan does *not* rule out TBI if other clinical indicators are present—much like how a normal chest X-ray does not eliminate the possibility of pneumonia if the patient has characteristic symptoms and other positive clinical findings.

Further, the *DSM-5-TR*[85] emphasizes that TBI diagnosis relies on objective evidence of cognitive decline through standardized neuropsychological testing, not solely on imaging findings. Neuropsychological assessments are designed to detect subtle cognitive changes and identify specific brain-based dysfunctions across distinct domains such as memory, attention, executive functioning, and processing speed—deficits that may not be captured by standard intelligence measures or routine clinical observations (i.e., "alert and oriented x 3"). Even brief screens (such as the Montreal Cognitive Assessment[86]) can reveal the characteristic pattern of cognitive impairments often seen following TBI, including the type of working memory deficits and executive functioning difficulties that distinguish TBI from other conditions.

In carceral settings, the need for systematic TBI screening and assessment is particularly critical considering that TBI is a common factor among many incarcerated persons. While there are no universally established standards mandating cognitive assessments specifically for carceral settings, the Center for Disease Control recommends that carceral facilities implement routine TBI

---

[83] Dikmen, S., Machamer, J., & Temkin, N. (2009). Neurobehavioral consequences of traumatic brain injury. In I. Grant & K. M. Adams (Eds.), *Neuropsychological assessment of neuropsychiatric and neuromedical disorders* (3rd ed., pp. 597–616). Oxford University Press.

[84] American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.).

[85] American Psychiatric Association. (2022). *Diagnostic and statistical manual of mental disorders* (5th ed., text rev.).

[86] Nasreddine, Z. S., Phillips, N. A., Bédirian, V., Charbonneau, S., Whitehead, V., Collin, I., Cummings, J. L., & Chertkow, H. (2005). The Montreal Cognitive Assessment, MoCA: A brief screening tool for mild cognitive impairment. *Journal of the American Geriatrics Society*, *53*(4), 695-699.

screening to identify individuals at risk for TBI at intake and immediately following a suspected TBI that occurs in the facility.[87] The failure to identify TBI can result in misattribution of TBI-related symptoms to behavioral problems, leading to inappropriate disciplinary actions rather than needed accommodations and treatment interventions. Further, such oversights not only affect institutional management but may also have serious implications for mental health outcomes, particularly related to suicide risk.

Emerging research suggests that the co-occurrence of PTSD and TBI may produce synergistic effects on suicide risk beyond what would be expected from either condition alone. For example, veterans with comorbid PTSD and TBI exhibited significantly higher rates of suicidal ideation compared to those with either condition in isolation.[88] In that study, the researchers proposed that the combination of TBI-related cognitive impairments and PTSD-related emotional dysregulation may create particular challenges for affected individuals in managing distress and resisting suicidal urges.

Given these research findings, comprehensive suicide risk assessment must include thorough evaluation of an individual's PTSD and TBI history. Clinicians should systematically inquire about past head injuries, episodes of loss of consciousness, and post-concussive symptoms, while simultaneously assessing trauma exposure history and PTSD-related symptomatology. When both conditions are present, particular attention should be paid to how these conditions may interact to influence current risk levels. Plaintiff Tucker's case illustrates the critical importance of this approach: his combination of head trauma history and trauma exposure created compounded vulnerabilities that culminated in a suicide attempt while on the RRL.

In sum, risk assessments for individuals with TBI and/or PTSD must consider additional factors that may compound vulnerability, including substance use disorders, chronic pain syndromes, social isolation, and access to lethal means. A comprehensive approach that examines the complex interplay of biological, psychological, and social risk factors remains essential for accurately identifying high-risk individuals and developing effective prevention and intervention strategies tailored to this vulnerable population.

**Examine Behavioral Changes as Potential Symptoms rather than Oppositional Conduct**

Carceral systems should avoid one-size-fits-all disciplinary approaches that fail to account for individual differences in cognitive capacity, trauma history, and neurological functioning. The fundamental shift from viewing disruptive behaviors as willful misconduct to understanding them as potential manifestations of underlying neurological and psychological conditions is a critical one. Neurobiological changes that can result from TBI are not character flaws or conscious choices, but rather direct consequences of brain injury that affect areas responsible for decision-making, behavioral inhibition, and emotional processing. Similarly, PTSD manifests through hypervigilance, irritability, and aggression—symptoms that represent the nervous system's adaptive response to trauma rather than deliberate defiance.

---

[87] Centers for Disease Control and Prevention. (2025, August 4). TBI and correctional facilities. https://www.cdc.gov/traumatic-brain-injury/health-equity/correctional-facilities.html

[88] Barnes, S. M., Monteith, L. L., Forster, J. E., Nazem, S., Borges, L. M., Stearns-Yoder, K. A., & Bahraini, N. H. (2019). Developing predictive models to enhance clinician prediction of suicide attempts among veterans with and without PTSD. *Suicide and Life-Threatening Behavior*, *49*(4), 1094-1104.

When carceral staff fail to recognize these behavioral changes as potential symptoms, they perpetuate a cycle of punishment that can worsen underlying conditions. An individual with TBI who struggles with impulse control may be perceived as deliberately disruptive, leading to disciplinary action rather than appropriate neurological assessment and accommodation. Likewise, someone with PTSD whose trauma responses are triggered by the authoritarian prison environment may be labeled as non-compliant rather than recognized as someone experiencing psychological distress requiring therapeutic intervention.

The mischaracterization of symptom-driven behaviors as oppositional conduct can lead to increased placement in SC, creating a "perfect storm" of risk factors. As documented in the literature, individuals with mental health conditions, including those with TBI and PTSD, are disproportionately represented in SC and are held there for significantly longer periods than those without such conditions. The psychological pain of uncertainty inherent in administrative segregation adds another layer of harm. Unlike disciplinary segregation with defined time limits, administrative segregation often involves indefinite placement with unclear criteria for release. This uncertainty causes additional psychological distress and can worsen symptoms of both TBI and PTSD, creating a vicious cycle where the "treatment" intensifies the underlying conditions driving the problematic behaviors. SC is a punitive response that can exacerbate the very symptoms that led to the initial behavioral concerns, resulting in a hopeless cycle.

**Limit Severity and Duration of Restrictive Housing**

Given the extensive evidence demonstrating the severe psychological harms of SC, particularly for individuals with TBI and PTSD, carceral facilities must implement strict limitations on both the severity of conditions and duration of RH placements. These limitations are not merely administrative preferences but essential safeguards to prevent constitutional violations and protect the fundamental human dignity of incarcerated individuals.

Research consistently demonstrates that the harmful effects of SC intensify with prolonged exposure. The PA DOC study referenced earlier[89] revealed that material deprivation, social isolation, and psychological distress all escalate with extended placement in RH. For individuals with pre-existing neurological or psychological vulnerabilities, this trajectory toward deterioration can be accelerated and more severe. Facilities should establish heightened scrutiny when imposing prolonged SC on individuals with documented TBI, PTSD, or other mental health conditions that significantly impair cognitive, emotional, or behavioral functioning. As in Plaintiff Tucker's case, such placements require careful consideration of the individual's vulnerabilities.

Even when RH is deemed necessary, the conditions must be the least restrictive possible to achieve legitimate penological objectives. As the Philadelphia Department of Behavioral Health and Intellectual disAbility Services has concluded in its official policy brief, solitary confinement is a "dehumanizing" practice "equated to psychological torture by the United Nations" with "detrimental and counterproductive behavioral and public health implications."[90] The dehumanizing conditions documented in research—including inadequate hygiene, clothing, and

---

[89] Western, B., Simes, J. T., & Bradner, K. (2022). Solitary confinement and institutional harm. *Incarceration*, *3*(1), 26326663211065644.

[90] Huppert, T., & Chard, A. (n.d.). Issue Brief: Solitary Confinement. City of Philadelphia, Department of Behavioral Health and Intellectual disAbility Services.

nutrition; confinement to one's cell for 23 or even 24 hours per day; and the sensory deprivation associated with it—are not inherent requirements of secure housing but rather policy choices that amplify psychological harm. While separation from the general population may sometimes be a justified as security precaution, the additional harsh conditions of RH (such as those experienced by Plaintiff Tucker during his PA DOC RRL placement[91]) has little utility for security purposes. In most cases, including Plaintiff Tucker's, prison administration's security objectives can be achieved through less restrictive means.

Several carceral systems across the United States have implemented humane alternatives to long-term SC with promising results. New York's HALT Act[92] established Residential Rehabilitation Units (RRUs) as therapeutic and trauma-informed alternatives that provide incarcerated individuals with at least five hours of out-of-cell programming daily, focusing on addressing underlying causes of problematic behaviors. In Colorado, the Department of Corrections developed a "Stepdown Program" that allows individuals to progress from four hours out-of-cell with therapy plus recreation to six hours out-of-cell with increased socialization opportunities.[93] The North Carolina Department of Corrections' Rehabilitative Diversion Unit (RDU) has shown reductions in mental health deterioration and self-injury incidents compared to traditional restrictive housing.[94] New York City jails implemented the Clinical Alternative to Punitive Segregation (CAPS) program, which provides therapeutic activities instead of isolation for individuals with mental illness, resulting in reduced self-harm and injuries compared to traditional RH units.[95] In their efforts to reduce the harmful psychological impacts of SC, these programs have shown promise in increasing institutional and individual inmate safety while promoting recovery from psychological distress.

For individuals with TBI and PTSD, additional accommodations may be necessary to prevent symptom exacerbation. Those with TBI may require modified cognitive stimulation to prevent further deterioration of already-compromised brain function. Individuals with PTSD may need specific environmental modifications to minimize trauma triggers and maintain some sense of safety and control. Opportunities for treatment engagement should provide a sense of safety (confidentiality as appropriate) and override re-traumatizing barriers (e.g., excessive and degrading strip-searches).

All RH placements should be subject to regular, meaningful review by multidisciplinary teams that include mental health professionals reasonably familiar with TBI and trauma-related conditions. Review teams must have authority to override standard placement decisions when clinical considerations warrant different treatment. This is particularly important for individuals

---

[91] *Tucker v. Wetzel*, No. 1:22-cv-00631-CCC-LT (M.D. Pa. Apr. 29, 2022).

[92] *Humane Alternatives to Long-Term (HALT) Solitary Confinement Act*, N.Y. Correct. Law § 137 (2021). https://www.nysenate.gov/legislation/bills/2021/s2836.

[93] Social Workers Against Solitary Confinement. (n.d.). Alternative policy to solitary confinement. Social Welfare Action Alliance.

[94] Remch, M., Mautz, C., Burke, E. G., Junker, G., Kaniuka, A., Proescholdbell, S., ... & Naumann, R. B. (2021). Impact of a prison therapeutic diversion unit on mental and behavioral health outcomes. *American Journal of Preventive Medicine*, *61*(5), 619-627.

[95] Glowa-Kollisch, S., Kaba, F., Waters, A., Leung, Y. J., Ford, E., & Venters, H. (2016). From punishment to treatment: the "Clinical Alternative to Punitive Segregation" (CAPS) program in New York City jails. *International journal of environmental research and public health*, *13*(2), 182.

whose behavioral problems may be manifestations of neurological or psychological symptoms rather than willful misconduct. The failure to recognize symptom-driven behaviors as such perpetuates the harmful cycle of punishment that research has shown to be counterproductive.

All RH housing decisions should be thoroughly documented, with clear articulation of the specific security concerns that justify the placement and the less restrictive alternatives that were considered and rejected. As in Plaintiff Tucker's case, for individuals with known head injury or PTSD, documentation should specifically address how their conditions were considered in the placement decision and what accommodations or modifications were implemented.

The implementation of these limitations requires a fundamental shift from viewing RH as a default response to behavioral problems toward understanding it as a last resort that should be used sparingly, briefly, and with maximum attention to individual vulnerabilities and human dignity. For individuals with TBI and PTSD, this shift is not merely advisable but essential to prevent serious psychological harm and potential constitutional violations.

**Alternative and Evidence-Based Programming**

Facilities should develop and implement alternative interventions that address security concerns without resorting to prolonged isolation. These may include enhanced mental health programming, therapeutic communities, structured conflict resolution processes, and increased staff training in trauma-informed and neurodiversity-sensitive approaches.

For individuals with TBI, alternatives might include cognitive rehabilitation programs, structured daily routines that accommodate attention and memory deficits, and modified housing arrangements that provide security while maintaining some level of social interaction. The PA DOC has partnered with the Brain Injury Association of Pennsylvania to implement the Neuro Resources Facilitation (NRF) Program, which reportedly incorporates individualized assessment of cognitive strengths and weaknesses, assistance with applications for specialized brain injury rehabilitation services, community support, and employment assistance.[96] The pilot program was available to individuals approaching release from SCI Graterford, and public reporting suggests the program was accessible to study participants by 2016.[97] A larger, multi-facility NRF project funded by the National Institute of Justice was planned, but from the public information available it is unclear whether NRF or other neurocognitive rehabilitation efforts are available to other PA DOC detainees.

A recent PTSD expert consensus statement (a formalized document representing the collective professional opinion of a group of recognized experts in a particular field) emphasized the urgent need for trauma-informed pathways in prisons, noting that trauma exposure is extremely common

[96] Nagele, D., Vaccaro, M., Schmidt, M. J., & Keating, D. (2018). Brain injury in an offender population: Implications for reentry and community transition. *Journal of Offender Rehabilitation*, *57*(8), 562-585.

[97] Keppler, N. (2016, November 24). What happened when a prison brought in a brain injury specialist. *VICE*. Retrieved from https://www.vice.com/en/article/what-happened-when-a-prison-enlisted-the-help-of-a-brain-injury-specialist/

among incarcerated individuals but that PTSD often goes undetected or untreated.[98] For those with PTSD, trauma-informed therapeutic interventions, peer support programs, and environmental modifications to reduce triggers will likely prove most effective.

## XI. CONCLUSION

SC can inflict serious psychological harm, particularly on incarcerated individuals with PTSD and TBI. Research shows they are disproportionately placed in SC, where the conditions of isolation exacerbate the very neurological and psychological symptoms that may have contributed to their initial behavioral difficulties.

In summary, the implementation of trauma-informed, neurodiversity-sensitive approaches, along with strict limitations on the use and duration of SC, is not merely a matter of policy preference for individuals such as Plaintiff Tucker's, but an imperative to prevent further psychological deterioration and protect the fundamental human dignity of all incarcerated individuals.

Pursuant to 28 U.S.C. § 1746, I declare the foregoing is true and correct.



Lauren Elizabeth Kois, PhD September 23, 2025

[98] Facer-Irwin, E., Karatzias, T., MacManus, D., Murphy, D., Cowlishaw, S., Forbes, D., Patel, K., Blackwood, N., & Dorries, C. (2024). An optimal trauma-informed pathway for PTSD, complex PTSD and other mental health and psychosocial impacts of trauma in prisons: An expert consensus statement. *Psychology, Crime & Law*, *30*(10), 1305-1325. https://doi.org/10.1080/1068316X.2024.2394807