2017 WL 913954
Only the Westlaw citation is currently available.
United States District Court, W.D. Pennsylvania.

Eric Wildcat HALL, Plaintiff,
v.
Rev. Ulrich KLEMM, Administrator for Religion, Volunteer, and Recreational Services, et al., Defendants.

Civil Action No. 15-20 E
|
Signed 02/01/2017

**Attorneys and Law Firms**

Alexandra T. Morgan-Kurtz, Pennsylvania Institutional Law Project, for Plaintiff.

Sandra A. Kozlowski, Pennsylvania Office of Attorney General Civil Litigation Section, Pittsburgh, PA, for Defendants.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

SUSAN PARADISE BAXTER, United States Magistrate Judge

### I. RECOMMENDATION

***1** For the reasons that follow, it is respectfully recommended that Defendants' motion for summary judgment [ECF No. 34] be denied. It is further recommended that Plaintiff's cross-motion for summary judgment [ECF No. 38] be granted as to the issue of Defendants' liability under Counts I and II of the complaint.

### II. REPORT

This civil action was filed by Plaintiff Eric Wildcat Hall, an inmate at SCI-Forest, pursuant to 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc-1 *et seq.* In this action, Plaintiff seeks redress for violations of his rights under the First Amendment and RLUIPA which allegedly occurred when the Defendants denied his requests for a modified Kosher diet. According to Plaintiff, the Defendants' denial was based on: (a) their personal perceptions that the diet he requested was inconsistent with his professed religion, and (b) the Department of Corrections' blanket prohibition on providing a kosher diet to individuals of non-Jewish faiths.

#### A. Factual Background

##### *1. The Parties*

Plaintiff is an inmate who was previously incarcerated at the State Correctional Institution in Albion ("SCI-Albion"). He is currently incarcerated at the State Correctional Institution in Forest ("SCI-Forest"). (PSMF ¶ 1.) [1]

At times relevant to this lawsuit, Defendant Shawn Kephart ("Kephart") was the Director of the Bureau of Treatment Services ("BTS") for the Pennsylvania Department of Corrections ("DOC"). (PSMF ¶ 4.) As BTS Director, Kephart's job duties included overseeing the BTS's treatment division, which includes all religious programming. (*Id.* ¶ 5.)

Defendant Reverend Ulrich Klemm ("Klemm") is the DOC's Religion, Volunteer, and Recreational Services Program Director. (PSMF ¶ 2.) Klemm's job duties include overseeing religious programming within all of the DOC's institutions, drafting and revising the DOC's Religious Accommodation Policy, and administering the Religious Accommodations Review Committee ("RARC"). (*Id.* ¶ 3.)

Defendant Reverend John Dugan ("Dugan") [2] was, at times relevant to this lawsuit, the Facility Chaplaincy Program Director ("FCPD") at SCI-Albion. (PSMF ¶ 6.) Defendant Reverend Glenn McQuown ("McQuown") is and was the FCPD at SCI-Forest. (*Id.* ¶ 7.) The FCPD's job duties include supervising all religious department staff, handling religious accommodation requests, and coordinating all permitted religious services, activities, and programs within the facility. (*Id.* ¶ 8.)

##### *2. Plaintiff's Professed Beliefs*

Plaintiff is an individual who identifies as Native American with Arapaho, Cherokee, and Seneca tribal ancestry. (PSMF ¶¶ 9, 10.) He was not raised within the confines of a tribal community and does not profess to be an expert on the heritage of the Arapaho, Cherokee, and Seneca tribes. (Hall Dep. at 9:13-17, ECF No. 41-6.) He admits that, while incarcerated at SCI-Albion, he did not participate in any

of the religious programming offered, and he quit going to cultural classes at SCI-Forest. (PSMF ¶ 11; Hall Dep. at 9:13-17, 32:4-6, 33:4-7.) However, he claims to practice his faith independently by praying, burning sage and tobacco, and reading books by Native American authors. (Hall Dep. at 33:12-34:11.) He attends religious services at SCI-Forest when they are offered. (*Id.* at 30:10-25.)

***2** A central tenet of Plaintiff's faith is that all animate and inanimate things, such as plants and animals, have a divine spirit which can be transferred to objects and people. (PSMF ¶ 12.) He believes that respect and thankfulness should be given to the spirit of the dietary food source, whether plant or animal. (*Id.* ¶ 13.) Plaintiff further states that animals should be treated humanely, with a prayer and offering of thanks being made to the spirit of an animal before and after taking its life; without humane treatment and a prayer and offering of thanks, the divine spirit is not properly respected and is placed into a state of anger and turmoil. (*Id.* ¶¶ 14-15.) Plaintiff views modern industrial animal breeding and slaughtering processes as inhumane in their treatment of animals; he feels these practices fail to show proper respect for the animal's divine spirit. (*Id.* ¶ 16.) Plaintiff believes that, when he consumes animal product from an animal that was not appropriately respected, its angry spirit will transfer to him and negatively impact his body and mind; this can include situations where he consumes food prepared with the same utensils or cookware that were used in connection with food product from a disrespected animal. (*Id.* ¶¶ 18-20.) Recognizing that the realities of incarceration prevent him from raising his own food and ensuring that the animals he consumes have received proper respect, Plaintiff believes his religion compels him to maintain a vegan lifestyle. (*Id.* ¶¶ 21-22.)

*3. The Process of Religious Accommodation Within the Pennsylvania DOC*

The Pennsylvania Department of Corrections employs a Religious Activities Procedures Manual ("DC-ADM 819"), to address requests by prisoners for religious accommodations. (Pl.'s Ex. G, ECF No. 41-7.) When an inmate requests a "non-grooming" religious accommodation, the first step he or she must take is to complete and submit a "Religious Accommodation Request Form-Non-Grooming Form." (PSMF ¶ 23.) According to DC-ADM 819, the FCPD must schedule an interview with the inmate within twenty working days thereafter regarding the request. (Pl.'s Ex. G at 4-9 to 4-10, ECF No. 41-7 at 63-64.) After interviewing the inmate, the FCPD makes a recommendation as to whether to grant the request and circulates that recommendation to representatives of various departments within the facility—including the Major of the Guard, Corrections Care Program Manager, and Facility Manager—for their approval. (*Id.* ¶ 26.) All religious diet and other food-related accommodation requests must also be reviewed and approved by the Food Service Manager. (*Id.* ¶ 27.) In assessing the sincerity of the inmate's request, the FCPD considers a number of factors, including the inmate's religious practice both prior to and during incarceration, his knowledge of the faith, any changing of faiths, some demonstration of his beliefs in a consistent way, and his explanation as to how the requested accommodation will further the faith practice. (PSMF ¶ 25.)

After the FCPD's recommendation is circulated among facility staff, it is forwarded to the Central Office for a final determination by the Religious Accommodation Review Committee ("RARC"), which is chaired by Klemm. [3] (PSMF ¶¶ 28, 30.) The RARC consists of various faith group representatives, as well as representatives from food service and security. (*Id.* ¶ 30.) Klemm is responsible for coordinating the discussion and evaluation of religious accommodation requests by the RARC, as well as drafting the response of the RARC to these requests. (*Id.* ¶ 32.) The RARC relies upon the information presented by the inmate in order to make the determination regarding the accommodation request. (DSMF ¶¶ 133-34, Klemm Dep. at 148:19-149:1, ECF No. 41-2.) [4] The decision process can also be aided by information obtained from the prison facility. (DSMF ¶ 135; Klemm Dep. at 149:1-4.)

Following the RARC meeting, the Bureau of Treatment Services prepares a formal suggested response to the inmate's request for the religious accommodation, which is subject to the approval of the Regional Deputy Secretary. (PSMF ¶ 37.) The final decision is sent to the FCPD, who then provides the inmate a copy of the final decision letter. (Id. ¶ 38.)

*4. Dietary Options within the Department of Corrections*

***3** When the FCPD receives a request for a religious diet, the FCPD gives the inmate the document "Religious Diets in the Department," which explains which diets are available and

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

the rules regarding them. (PSMF ¶ 39.) According to written DOC policy, an inmate seeking a religious diet other than one currently offered by the DOC must explain on his Religious Accommodation Request Form how he thinks the DOC can best accommodate his religious dietary requirements. (*Id.* ¶ 40.)

In practice, the DOC offers only three meal accommodations for religious diets: the "Alternative Protein Source Entree," the "No Animal Products Diet," and the "Kosher Diet." (PSMF ¶ 42.) The Alternative Protein Source Entree (at times referred to herein as the "Alternative Protein Diet") does not contain animal flesh or animal by-products and can be obtained by an inmate without submitting a religious accommodation request. (*Id.* ¶ 43.) However, the Alternative Protein Source Entree is cooked in the same kitchen as the prison's mainline diet, which *does* contain animal flesh and by-products. (*Id.* ¶ 44.) In addition, the side dishes for the Alternative Protein Source Entree are the same as those on the mainline diet and may or may not contain animal product. (*Id.* ¶ 45.)

The No-Animal Products Diet is approved for bona-fide religious reasons only and can only be obtained by submitting a religious accommodation request. (PSMF ¶ 46.) The food items on this diet are free from all animal flesh and contain no animal derived food sources or by-products; however, these food items—like the Alternative Protein Source Entree—are cooked in the same kitchen as the mainline diet, which does contain animal flesh and by-products. (*Id.* ¶¶ 47-48.)

The Kosher Diet is approved for bona fide religious reasons, and can only be obtained by submitting a religious accommodation request. (PSMF ¶ 49.) The dietary menu typically consists of the following: (1) breakfast: fresh fruit, cold cereal, bread, peanut butter, jelly, and milk; (2) lunch: raw vegetables, fresh fruit, bread, graham crackers, peanut butter or marinated bean salad, jelly, beverage; (3) dinner: raw vegetables, fresh fruit, bread, graham crackers, cottage cheese or marinated bean salad, jelly, beverage. (*Id.* ¶ 50.) These foods are prepared in a separate kitchen with utensils that are separate from those used in the preparation of all other diets. (*Id.* ¶ 54.) The only animal products in the Kosher Diet are milk and cottage cheese, both of which are kept in containers that are separated from all other food items in the Kosher Diet. (*Id.* ¶ 55.) Although the DOC's written policies do not restrict the Kosher Diet to any particular religious faith, Defendants acknowledge that the practical implementation of this diet has been limited to inmates of Jewish faith or other faiths that are derivatives of Judaism. (*Id.* ¶¶ 51-52.)

Apart from these three diets, the DOC kitchen staff regularly creates separate, individualized meals (or "therapeutic diets") for inmates with allergies or other health concerns. (PSMF ¶ 60.) For example, an inmate who is allergic to tomatoes would have his pasta prepared separately if the meal included meat sauce as a component. (*Id.* ¶ 61.) Because of the manner in which food cost sheets and product lists are maintained, Defendants do not possess any data as to the cost of individual diets. (*Id.* ¶ 59.) Defendants acknowledge, however, that an inmate's participation in a therapeutic diet does not increase the prison's labor costs for food preparation. (*Id.* ¶ 65.)

*5. Plaintiff's Requests for a Religious Dietary Accommodation at SCI-Albion*

***4** Plaintiff believes that, of the religious diets provided by the DOC, the one most compatible with his religious beliefs is the Kosher Diet. (PSMF ¶ 66.) Plaintiff is also lactose intolerant and, at all times relevant to this litigation, was on a therapeutic lactose-free diet as prescribed by his physician. (Hall Dep. at 12:6-22.) Plaintiff believes that those animal products offered in the Kosher diet, namely milk and cottage cheese, can easily be replaced with other uncontaminated protein or caloric alternatives already offered to other prisoners as part of the "enhanced" diet bag, including crackers, bread, peanut butter, jelly, and soy milk. (PSMF ¶ 67.)

In August 2012, while housed at SCI-Albion, Plaintiff submitted a request to Dugan for "a diet more consistent with [his] religious beliefs (Native American)." (Pl.'s Ex. A-1, ECF No. 42 at p. 7.) In particular, Plaintiff requested a diet "that is comparable with the Jewish Kosher diet and also precludes all meats, Dairy, Fish and Poultry, including eggs, and utensils in food preparation." (*Id.*) Dugan responded in writing that Plaintiff needed to file a request for a Kosher diet. (*Id.*; PSMF ¶ 70.)

Plaintiff subsequently completed an Inmate Religious Accommodation Request Form on August 24, 2012 in which he checked boxes for "Kosher Diet" and "[s]ome other accommodation." (Pl.'s Ex. A-2, ECF No. 42 at p. 9.) He elaborated that "[t]he diet that is most compliant with Native American spiritual traditions, here at S.C.I. Albion, is the Kosher Diet offered to members of the Jewish Faith,

excluding the milk which can easily be substituted with soy milk powder package." (*Id.*) Plaintiff explained the "basic teachings of [his] faith" as follows:

1. Living in balance and harmony with nature.

2. Praying and giving a[n] offering of thanks when taking the life of a[n] animal for food.

3. That all animate and inanimate things have spirit and that spirits can be put in turmoil as is the case of animal life subjected to torture during the modern production of animal food products and utensils used in preparation.

4. Others not enumerated.

(Id.) Asked to explain how he had demonstrated a sincerely held religious belief during the course of his incarceration, Plaintiff wrote:

> Practiced these beliefs prior to incarceration, co-founded the first Native American Circle in the D.O.C. at S.C.I. Huntington in 1982, campaigned for the creation [and] implementation of the haircut exemption and accommodation for Native Americans, Financially support (as able) Nat. Amer. struggles for self determination—religious expression on the outside, Do not worship with child molestors [sic], pray privately, no texts.

(*Id.*)

Within a day or two after filing his Religious Accommodation Request Form, Plaintiff was interviewed by Dugan concerning his request. (PSMF ¶ 74.) Plaintiff claims that, during the interview, he described his religious beliefs to Dugan and explained why the Kosher Diet would be the best accommodation. (*Id.* ¶ 75; Hall Decl. ¶ 22, ECF No. 42; Hall Dep. at 16:7-24.) According to Plaintiff, Dugan did not ask any questions about his religious preferences but suggested that Plaintiff could be accommodated by the Alternative Protein Diet. (PSMF ¶¶ 76-77; Hall Decl. ¶¶ 23-24; Hall Dep. at 16:18-17:15.) Plaintiff explained that the Alternative Protein Diet would not be compliant with his religious beliefs because the food was prepared with utensils that came into contact with animal product. (PSMF ¶ 78; Hall Decl. ¶ 25.) In response, Dugan commented that most inmates, after a couple weeks, lose their will to remain on the Kosher Diet because of the limited food choices. (PSMF ¶ 79, Hall Decl. ¶ 26; *id.* at 18:10-15.) Dugan concluded the interview by informing Plaintiff that he would be denying his request. (PSMF ¶ 81, Hall Decl. ¶ 27; Hall Dep. at 16:18-18:15.) Dugan then forwarded Plaintiff's request to the RARC for review. (PSMF ¶ 82.)

***5** On August 26, 2012, Plaintiff sent a letter to Klemm in support of his request for a dietary accommodation. In his letter, Plaintiff noted that Dugan's position "seemed to be that because I was not Jewish I could not recieve [sic] a Kosher diet, mistakenly thinking I was requesting a Kosher diet." (Pl.'s Ex. J at p. 2, ECF No. 41-10.) Plaintiff clarified that he was requesting a diet that conforms with his Native American spiritual beliefs, and "the diet here at S.C.I. Albion that is most compliant with these beliefs is the kosher diet offered to those of the Jewish faith...." (*Id.*) Plaintiff acknowledged that items in the Kosher Diet such as milk, cottage cheese and butter would have to be excluded, but he posited they could "easily be substituted with some other uncontaminated protien [sic] alternative such as a[n] enhanced diet bag containing protien [sic] and caloric alternatives, which are already provided to other prisoners (i.e., fresh fruit, crackers, bread, peanut butter, jelly, and soy milk)." (*Id.*) "As things stand at this time," Plaintiff wrote, "I am forced to eat foods that are not compliant with Native American Spiritual traditions and absent the granting of a religious diet accommodation I will have to supplement my diet with commissary purchases...." (*Id.*) While Plaintiff did "not claim to be an authority on Native American spiritual traditions," he maintained that the "basic teachings" set forth in this request could be "easily verified" by consulting an authority on Native American spiritual traditions. (*Id.*)

On October, 23, 2012, the RARC met to discuss Plaintiff's accommodation request. (Pl.'s Ex. T, ECF No. 48-1.) The Committee consisted of Kephart, Klemm, a Jewish rabbi, a Native American practitioner, and a representative of security. (*Id.*) The RARC voted to deny Plaintiff's request on the grounds that "[i]nmates who identify with the Native American tradition are not mandated to maintain a kosher diet. Inmate's dietary preference may most easily be met by the alternative protein option offered through the Master Menu." (Pl.'s Ex. V, ECF No. 48-3.)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

On November 9, 2012, Kephart issued a formal recommendation that Plaintiff's request for a religious diet be denied. (Pl.'s Ex. K, ECF No. 41-11.) Kephart's recommendation echoed the RARC's reasoning that inmates identifying with the Native American tradition are "not mandated to maintain a Kosher Diet," and Plaintiff's "dietary preference" could be most easily satisfied through the Alternative Protein Diet offered through the mainline menu. (*Id.*) The DOC's Regional Deputy Secretary concurred with Kephart's recommendation on November 14, 2012, and the final decision was conveyed to Plaintiff on December 5, 2012. (Pl.'s Ex. L, ECF No. 41-12.) Plaintiff grieved the rejection of his religious accommodation request, but the grievance was denied. (Pl.'s Ex. I, ECF No. 41-9.)

As a result of the denial of his dietary request, Plaintiff subsisted on items from the commissary, such as soups, cookies, ramen noodles without the seasoning packets and prepackaged snack foods such as chips, cookies, and candy. (Hall Decl. ¶¶ 31-32; Hall Dep. at 39:4-40:18.) At times, he would barter with other inmates, trading items that he had purchased at the commissary for fruit or other items that did not contain animal products. (Hall Dep. at 39:4-40:18.) Plaintiff claims that, due to inadequate food choices and limited financial resources, his health suffered while at SCI-Albion, and he experienced weight loss, fatigue, dizziness, and headaches. (Hall Dec. ¶ 30.)

*6. Plaintiff's Requests for a Religious Dietary Accommodation at SCI-Forest*

In early March 2014, Plaintiff was transferred from SCI-Albion to SCI-Forest. (PSMF ¶ 94.) Plaintiff alleges that, during the transfer process, he lost consciousness due to the malnutrition he experienced after the denial of his religious diet request. (Hall Decl. ¶ 33.) He states that, out of a concern for his health, he returned, under "duress," to eating the meals served in the dining hall. (Hall Dec. ¶ 34; Hall Dep. at 40:18-41:5.) Upon regaining his strength, Plaintiff again began relying primarily on the commissary for food items that were consistent with his religious beliefs. (Hall Dec. ¶ 35.)

In April 2014, Plaintiff submitted a second request for a religious diet accommodation. (PSMF ¶ 100.) In completing the Inmate Religious Accommodation Request Form, Plaintiff checked the box for "some other accommodation" and again explained that "[t]he diet that is most compliant with Native American spiritual traditions" was the "kosher diet offered to members of the Jewish Faith, excluding cooked foods by the dietary department, non-contact with cookware-serving utensils, eating utensils & trays and all animal products." (Pl.'s Ex. N, ECF No. 41-14.) In explaining the "basic teachings" of his faith and the ways in which he had demonstrated the sincerity of his religious beliefs, Plaintiff supplied the same information that he had included in his prior Religious Accommodation Request Form. (Pl.'s Ex. N, ECF No. 41-14; Pl.'s Ex. A-2, ECF No. 42 at p. 9.)

***6** On April 14, 2014, Plaintiff submitted a written "Request to Staff Member" requesting weekly religious services and inquiring into the status of his religious diet request. (Pl.'s Ex. O, ECF No. 41-15; PSMF ¶ 101.) Defendant McQuown informed Plaintiff that his request would be denied because his requested accommodation had already been rejected and the denial would stand for one year. (Pl.'s Ex. O; PSMF ¶ 102.) McQuown advised Plaintiff that the Kosher Diet was for Jewish inmates only and further stated that the Native American diet includes meat. (*Id.*)

Thereafter, McQuown forwarded Plaintiff's request to the RARC with the recommendation that it be denied. (Pl.'s Ex. P, ECF No. 51.) McQuown's rationale was as follows:

> Inmate Hall is a Native American requesting a Jewish Kosher Diet. Native American Faith and Judaism are so far different from one another that they have virtually nothing in common. Native American faith does not have any required dietary restrictions. He also requests an adaptation of the Kosher Diet and substitutes are prohibited. Since Native American faith is incompatible with Jewish faith, and, in light of [the] Kosher Diet being a religiously restricted diet by various religious requirements and traditions[,] this accommodation should be denied.

(Id.)

After meeting on June 24, 2014, the RARC recommended a denial of Plaintiff's request. (Pl.'s Ex. U, ECF No. 48-2; Pl.'s Ex. W, ECF No. 48-4.) The Committee reasoned that: (1)

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Plaintiff had failed to explain why the Kosher Diet offered to members of the Jewish faith was the one most compliant with Native American spiritual traditions; (2) his request seemed to be a personal preference that was not grounded in Native American spirituality or practices; and (3) he had failed to explain why his "personal dietary preference" could not be satisfied by selecting the Alternative Protein Diet from the mainline menu. (Pl.'s Ex. U, ECF No. 48-2; Pl.'s Ex. W, EF No. 48-4; PSMF ¶ 104.)

On July 8, 2014, Kephart issued a formal recommendation to the Regional Deputy Secretary that Plaintiff's religious accommodation request be denied. (Pl.'s Ex. Q, ECF No. 41-16.) Kephart's rationale mirrored that of the RARC:

> Inmate fails to give the reasons why "the diet that is most compliant with Native American spiritual traditions ... is the kosher diet offered to members of the Jewish faith ..." The request for a Kosher Diet seems to be a personal preference and one that is not grounded in Native American spirituality or is the practice of Native Americans in the community. The inmate, who seeks to "live in balance and harmony with nature[,]" also fails to state why his personal dietary preference cannot be met by selecting the Alternative Protein Option offered through the Master Menu.

(*Id.*) The Regional Deputy Secretary concurred with Kephart's recommendation, and Plaintiff was notified of the denial of his request on July 11, 2014. (*Id.*)

B. Procedural Background

On January 14, 2015, Plaintiff initiated this action with the filing of his two-count complaint (ECF No. 1) against Klemm, Kephart, Dugan, and McQuown. Count I of the complaint asserts a claim under the RLUIPA, and Count II asserts a claim under 42 U.S.C. § 1983 for the violation of Plaintiff's First Amendment Right to freely exercise his religion. By way of relief, Plaintiff seeks, among other things: (1) a declaratory judgment that Defendants violated Plaintiff's constitutional, civil, and statutory rights; (2) compensatory damages; and (3) an injunction ordering Defendants to provide Plaintiff with a diet that is consistent with his religious beliefs.

***7** Plaintiff filed a motion for preliminary injunction on March 27, 2014 (ECF No. 5). Thereafter, the parties negotiated an arrangement whereby Plaintiff would receive a diet consistent with his religious beliefs (PSMF ¶ 107), and the motion for a preliminary injunction was subsequently withdrawn (ECF No. 19). The religious diet that was created for Plaintiff—and which he is still receiving—is prepared in the same manner as the Kosher Diet, but with the inclusion of tofu and soy milk. (PSMF ¶ 62.)

Following a period of discovery, Defendants filed their motion for summary judgment and related materials (ECF Nos. 34, 35, 36, 37) on July 22, 2016. Thereafter, Plaintiff filed a cross motion for summary judgment and related materials (ECF Nos. 38, 39, 40, 41, 41, 42). Each side was given an opportunity to respond to the opposing party's motion (ECF Nos. 46, 47, 48, 50). As a result, the issues are sufficiently joined and ripe for resolution.

C. Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When applying this standard, the court must examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). The burden then shifts to the non-movant, who must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. *Celotex*, 477 U.S. at 322; *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). The non-moving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Garcia v. Kimmell*, 381 Fed.Appx. 211, 213 (3d Cir. May 26, 2010) (quoting *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005)).

When considering a motion for summary judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both

genuine and material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

A material fact is a fact whose resolution will affect the outcome of the case under applicable law. *Anderson*, 477 U.S. at 248. Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Id.* at 247–249.

D. Discussion

*1. Plaintiff's § 1983 Claim*

In Count II of the complaint, Plaintiff alleges that Defendants violated his First Amendment right to freely exercise his religion.[5] It is established law that convicted prisoners retain the protections afforded by the First Amendment, "including its directive that no law shall prohibit the free exercise of religion." *DeHart v. Horn*, 227 F.3d 47, 50 (3d Cir. 2000) (quoting *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted)). "Nevertheless, the fact of incarceration and the valid penological objectives of deterrence of crime, rehabilitation of prisoners, and institutional security justify limitations on the exercise of constitutional rights by inmates." *Id.* at 50-51 (citing *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974)).

***8** In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court held that a prison regulation which impinges on an inmate's constitutional rights is valid if it is reasonably related to legitimate penological interests. *Id.* at 89. Four factors must be weighed in determining the overall reasonableness of the challenged regulation:

> "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," and this connection must not be "so remote as to render the policy arbitrary or irrational." Second, a court must consider whether inmates retain alternative means of exercising the circumscribed right. Third, a court must take into account the costs that accommodating the right would impose on other inmates, guards, and prison resources generally. And fourth, a court must consider whether there are alternatives to the regulation that "fully accommodate[ ] the prisoner's rights at de minimis cost to valid penological interests."

*DeHart,* 227 F.3d at 51 (quoting *Waterman v. Farmer,* 183 F.3d 208, 213 (3d Cir. 1999)) (alteration in the original). "[T]he burden is not on the state to prove the validity of the challenged prison regulation but instead is on the inmate to disprove it." *Williams v. Morton*, 343 F.3d 212, 217 (3d Cir. 2003) (citing *Overton v. Bazzetta*, 539 U.S. 126 (2003)).

a) IS A CONSTITUTIONALLY PROTECTED INTEREST AT STAKE?

In order for a prisoner to successfully challenge a prison regulation on religious freedom grounds, he must first demonstrate that a constitutionally protected interest is at stake. *DeHart,* 227 F.3d at 51 ("[T]he *Turner* analysis is appropriate only in cases where a prison policy is impinging on inmates' constitutional rights."). To do so, the prisoner must show that the religious beliefs that serve as the basis for his requested accommodation are both "sincerely held" and "religious in nature." *Id.* at 51-52 (quoting *Africa v. Pennsylvania*, 662 F.2d 1025, 1030 (3d Cir. 1981)). Thus, "if a prisoner's request for a particular diet is *not* the result of sincerely held religious beliefs, the First Amendment imposes no obligation on the prison to honor that request." *Id.* at 52. In making this assessment, the reviewing court may consider whether a belief is "truly held," but it must not "attempt to assess the truth or falsity of an announced article of faith." *Africa*, 662 F.2d at 1030.

In this case, there is ample evidence to support the conclusion that Plaintiff's beliefs concerning his need for a special diet are religious in nature and sincerely held. Regarding the issue of sincerity, Plaintiff provided a sworn declaration setting forth his uncontested assertion that he had "followed Native American religious beliefs for over 40 years...." (Hall Decl. ¶ 4, ECF No. 42.) Although Plaintiff did not regularly attend Native American religious services or cultural classes, he testified that he pursued his faith independently through

books, prayer, meditation, and ceremonies such as the burning sage and tobacco. He also participated in ceremonies such as the 2014 harvest meal. For a considerable period of time, despite being twice denied a religious accommodation, Plaintiff pursued the diet that he felt was most compatible with his faith by eschewing items from the mainline menu and relying instead on items purchased from the commissary at his own expense. The fact that Plaintiff did not regularly attend religious services or cultural classes in the prison does not preclude a finding of sincerity on his part. *See* *Mosier v. Maynard*, 937 F.2d 1521, 1523 (10th Cir. 1991) ("Merely because plaintiff is not a member of the Cherokee nation or the Native American worship group at the prison does not mean that his belief is insincere. The Supreme Court has rejected the notion that membership in a religious organization is a prerequisite for religious convictions to be judged sincere.") (citing *Frazee v. Department of Employment Sec.*, 489 U.S. 829, 834 (1989)). Nor does sincerity require perfection in the practice of religious canons. As one court has observed, "[n]o court can realistically expect perfect moral purity of any adherent to any religion. Human history and, indeed, the teaching of major religions of the world in and of themselves tell us that most mortals are fallible and do not always live up to the highest moral ideals of their religious faith." *Reed v. Faulkner*, 653 F. Supp. 965, 971 (N.D. Ind. 1987). Although Defendants characterize Plaintiff's dietary request as a matter of mere "personal preference," nowhere in their brief did they squarely address the issue of Plaintiff's sincerity, nor did they point to evidence that would demonstrate the existence of a genuine dispute concerning this point. Thus, Plaintiff has established the sincerity of his belief that he must restrict himself to a vegan diet that is prepared in a kosher manner.

***9** The record also establishes that Plaintiff's stated beliefs are religious in nature. In *Africa v. Com. of Pa.*, 662 F.2d 1025 (3d Cir. 1981), the Third Circuit Court of Appeals set forth three "useful indicia" of religion, which courts can reference in determining whether a plaintiff's professed belief is religious, as opposed to merely personal or philosophical: "First, a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters. Second, a religion is comprehensive in nature; it consists of a belief-system as opposed to an isolated teaching. Third, a religion often can be recognized by the presence of certain formal and external signs." 662 F.2d at 1032. In the context of this case, the foregoing indicia support a finding that Plaintiff's professed beliefs are religious in nature. First, Plaintiff's belief that certain foods will transfer angry animal spirits to his own mind and body clearly involves deep and imponderable matters that go beyond matters of mere personal dietary preference. Second, Plaintiff's professed dietary beliefs are part of a larger spiritual belief system that involves "living in harmony and balance with nature." (Pl.'s Ex. A-2, ECF No. 42 at 9; Pl.'s Ex. N, ECF No. 41-14.) Third, the record shows—and Defendants do not appear to dispute—that the DOC considers Native American spirituality a *bona fide* religion which is recognizable by certain formal and external signs, as evidenced by the fact that the DOC maintains a Native American faith group representative as part of the RARC and has accommodated religious practices such as smudging ceremonies. (*See* Pl.'s Ex. T, ECF No. 48-1; Hall Dep. at 47:16-48:19.)

Defendants do not offer any argument in their brief that contradicts the foregoing analysis. As noted, to the extent they dispute Plaintiff's entitlement to a First Amendment accommodation, they do so on the grounds that Plaintiff's requested diet was solely a matter of "personal preference," as opposed to a legitimate religious tenet. As support for their argument, they cite *Moore v. Cucchi,* Civil No. 09-2217 (JAP), 2011 WL 4594907 (D.N.J. Sept. 30, 2011). In that case, an inmate who was a vegetarian and a Buddhist asserted claims under the First Amendment and RLUIPA based on his complaints about the non-meat diet he had been receiving in prison. The court found that the plaintiff had failed to allege facts implicating the infringement of a constitutional right, and it dismissed the claims. Notably, the plaintiff had failed to "allege facts showing that the diet he was served ... included meat or violated his Buddhist beliefs in any way." 2011 WL 4594907, at *3. To the extent the plaintiff had alleged intermittent problems with his food, the court found that "those issues impose[d] only a de minimis burden on his religion and thus [did] not violate the Free Exercise Clause or RLUIPA." *Id.* The court concluded that the plaintiff's dissatisfaction with his diet was insufficient to support a viable claim because "an inmate has no constitutional right to a diet based on personal preference." *Id.,* at *4.

The facts alleged in *Moore* are readily distinguishable from the facts at issue in this case. Here, unlike in *Moore,* Plaintiff has adduced evidence showing that the diet he was offered at SCI-Albion and SCI-Forest violated his sincerely held religious beliefs. Plaintiff stated in his deposition and sworn declaration that he feels constrained by his faith to avoid consuming any food item that contains animal product or has come into contact with utensils or cookware that were used

in connection with animal product. The evidence before the Court establishes more than a *de minimis* burden on Plaintiff's professed beliefs, as Plaintiff was denied a religious diet for a considerable period of time and felt compelled to subsist on items from the commissary in lieu of consuming the food items available on the prison's mainline menu. Accordingly, unlike in *Moore,* the facts involved in this case support a finding that Plaintiff's dietary request was a matter of sincere religious belief, and not merely personal preference.

In characterizing Plaintiff's requested diet as a matter of "personal preference," Defendants essentially dispute the *accuracy* of Plaintiff's religious convictions. They admit that Plaintiff's religious accommodation request was denied based on the conclusion that "inmates who identify with the Native American tradition are not mandated to maintain a kosher diet." (Defs.' Br. at 4.) Thus, Defendants' decision was based on their view that Plaintiff's beliefs were outside the mainstream of Native American spiritual beliefs. It is well established, however, that a sincerely held religious belief may be constitutionally protected irrespective of the fact that it is outside of the mainstream of a particular religion. *See, e.g., Holt v. Hobbs,* —— U.S. ——, 135 S. Ct. 853, 862-63 (2015) (discussing a claim under the RLUIPA and noting that "the protection of RLUIPA, no less than the guarantee of the Free Exercise Clause, is 'not limited to beliefs which are shared by all of the members of a religious sect' ")(quoting *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 715–16 (1981)); *DeHart*, 227 F.3d at 56 ("It would be inconsistent with a long line of Supreme Court precedent to accord less respect to a sincerely held religious belief solely because it is not held by others."); *Parkell v. Senato*, No. CV 14-446-SLR, 2016 WL 7217623, at *8 (D. Del. Dec. 13, 2016) ("[I]n addressing a prisoner's request for a particular diet, the question is not whether such a diet is an orthodox requirement of a particular religion, but whether the prisoner's belief that such a diet is necessary is sincerely held and religious in nature in the prisoner's scheme of things.") (citing *DeHart,* 227 F.3d at 51); *Varsanyi v. Piazza*, No. 3:CV-10-2072, 2015 WL 1643036, at *5 (M.D. Pa. Apr. 9, 2015)("The law is also clear that a religious practice is protected even if it is not deemed to be mandatory or practiced by every member of the religion.") (citing *Thomas* and *DeHart*). Furthermore, "clergy opinion has generally been deemed insufficient to override a prisoner's sincerely held religious belief." *Koger v. Bryan,* 525 F.3d 789, 799 (7th Cir. 2008) (citing authority).

***10** Defendants also attempt to justify the denial of Plaintiff's dietary request on the ground that Plaintiff failed to explain why his dietary preferences could not be met by selecting the Alternative Protein Diet. (*See* PSMF ¶¶ 104-105; DSMF ¶ 127.) This line of argument overlooks the fact that Plaintiff's Religious Accommodation Request Form referenced his belief that he needs to avoid contact with contaminated cooking ware and utensils. (Pl.'s Ex. N.) In addition, Plaintiff submitted unrebutted evidence in his sworn declaration that he discussed his religious beliefs, including the insufficiency of the Alternative Protein Diet, with Dugan in connection with his first request for a religious diet. (Hall Dec. ¶ 25, ECF No. 42.) More to the point, however, Defendants' argument is not probative concerning the issue of whether Plaintiff actually believes what he professes and whether his stated beliefs are "religious" in nature. Accordingly, Defendants have failed to demonstrate the existence of a genuine issue of fact concerning the issue of whether Plaintiff's request for a religious diet implicated a constitutionally protected interest.

b) WAS THE DEFENDANTS' INFRINGEMENT OF PLAINTIFF'S FIRST AMENDMENT RIGHTS VALID UNDER *TURNER V. SAFLEY*?

Because Plaintiff's request for a religious diet implicated his First Amendment right to freely exercise his religion, the Court must assess whether Defendants' denial of the accommodation was "reasonably related to legitimate penological interests." *Turner,* 482 U.S. at 89; *DeHart,* 227 F.3d at 51. The burden of establishing this connection lies with the Defendants, but the Court must afford "substantial deference" to their professional judgment." *Cook v. Corbett,* Civ. A. No. 14-5895, 2016 WL 1660557, at *5 (E.D. Pa. April 26, 2016)(quoting *Fontroy v. Beard*, 559 F.3d 173, 177 (3d Cir. 2009)).

Defendants summarily assert—without further analysis—that the DOC has a legitimate penological interest in simplifying food service, which was rationally served by its decision to limit Plaintiff's food choices to the alternative protein and non-meat diets from the mainline menu. Federal courts have recognized that simplifying food services is a legitimate penological interest. *See, e.g., Williams v. Morton,* 343 F.3d 212, 217 (3d Cir. 2003)("Prisoners do not dispute that simplified food service, security, and budget constraints are

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

legitimate penological interests. Indeed, our prior decisions preclude such an argument.")(citing *Fraise v. Terhune,* 283 F.3d 506, 517–18 (3d Cir. 2002) (finding security to be a legitimate penological interest); *DeHart,* 227 F.3d at 53 (finding simplified food service to be a legitimate penological interest)); *see also* *Jewell v. Gonzales,* 420 F. Supp. 2d 406, 427 (W.D. Pa. 2006) ("Promoting the efficient allocation of prison resources has been recognized as a legitimate governmental interest.").

Defendants did not cite this particular penological interest at the time they denied Plaintiff's request for a religious accommodation. Thus, it is questionable whether the stated interest could serve as grounds, in the abstract, for denying Plaintiff the diet he requested. *See, e.g.,* *Salahuddin v. Goord*, 467 F.3d 263, 276-77 (2d Cir. 2006) (holding that prison officials must show that they "actually had, not just could have had, a legitimate reason for burdening protected activity" to survive summary judgment); *Flagner v. Wilkinson*, 241 F.3d 475, 487 (6th Cir. 2001) ("[T]he defendants here have articulated a list of generalized concerns regarding the impact of exempting Flagner from the grooming regulation. Flagner, however, has demonstrated the absence of a factual basis for these penological concerns and has thereby called into question the credibility of those assertions."); *Quinn v. Nix*, 983 F.2d 115, 118 (8th Cir. 1993) ("Prison officials are not entitled to the deference described in *Turner* ... if their actions are not actually motivated by legitimate penological interests at the time they act.").

Regardless, the circumstances of this case do not support the conclusion that the Defendants' denial of Plaintiff's requested diet rationally advanced the DOC's interest in simplification of its food services. Essentially, Plaintiff requested that the Defendants provide a modified form of the Kosher Diet, substituting items such as soy milk for dairy items. It is undisputed that Kosher meals are regularly provided as a religious accommodation for inmates who practice Judaism. It is also undisputed that, at all times relevant to this litigation, Plaintiff was on a medically-prescribed diet to address lactose intolerance. Under these circumstances, the accommodation Plaintiff requested would not have presented any substantial complications beyond those that the prisons' food staffers were already facing. Accordingly, the denial of Plaintiff's dietary request did not rationally advance the DOC's interest in simplifying its food services. *See* *Cook v. Corbett,* Civil Action No. 14-5895, 2016 WL 1660557, at *5 (E.D. Pa. April 26, 2016) (rejecting the argument that simplicity of prison's food service program would be compromised by granting inmate's request for a Kosher diet, as it was "undisputed that SCI Graterford makes Kosher meals available to other inmates").

***11** The Supreme Court has acknowledged the particular importance of the first *Turner* factor, explaining that in some cases the second, third, and fourth factors can "add little, one way or another, to the first factor's basic logical rationale." *Beard v. Banks*, 548 U.S. 521, 532 (2006). In fact, if the first *Turner* factor is not satisfied—*i.e.,* if the prison regulation at issue does not rationally advance the stated penological interest, it is not technically necessary to consider the remaining *Turner* factors. *See* *Cook,* 2016 WL 1660557, at *6 ("Having concluded that there is no 'valid, rational connection' between the denial of Cook's request for a Kosher meal and the interests presented to justify it, we need not reach the remaining *Turner* factors.").

Nevertheless, the Court will conduct a full *Turner* analysis. The second factor requires the court to consider whether Plaintiff has available alternative means of exercising his First Amendment rights. The U.S. Court of Appeals for the Third Circuit has clarified that the relevant inquiry is whether the inmate has alternative means of exercising his religious beliefs generally, *e.g.*, by prayer, worship, meditation, or the like. *DeHart,* 227 F.3d at 54. Here, there is no dispute that Plaintiff had other means of exercising religious rights, even though he was denied a religious diet. Thus, the second *Turner* factor supports a finding of reasonableness.

The third *Turner* factor requires the Court to consider the costs that accommodation of the religious request would impose on other inmates, guards, and prison resources generally. Here, Defendants have proffered no evidence to document the actual costs associated with accommodating Plaintiff's dietary request, [6] and any burden in this regard would appear be minimal in light of the fact that Kosher meals are already provided to Jewish inmates and Plaintiff was already receiving a medically prescribed diet due to his lactose intolerance. *See* *DeHart,* 227 F.3d at 58 (noting that the third *Turner* factor "[could not] be satisfactorily evaluated without taking account [of] the fact that the dietary needs of Jewish inmates are apparently accommodated without substantial negative consequences in terms of efficiency and security."). Factor three thus cuts against a finding of reasonableness.

The fourth *Turner* factor requires the court to consider whether there are alternatives to the prison regulation that fully accommodate the prisoner's rights at *de minimis* cost to valid penological interests. Here, the record shows that, since March 2015, Defendants have been providing Plaintiff a diet that complies with his religious beliefs, without incident. (*See* PSMF ¶¶ 107-111.) This diet is prepared in the same manner as the Kosher meals, the only difference being the inclusion of tofu and soy milk as substitutes for Kosher dairy items in order to address Plaintiff's lactose intolerance. (PSMF ¶¶ 62, 108, 110.) Tofu and soy milk are in ready supply and do not need to be specially ordered for Plaintiff, although his diet requires that some additional quantify of tofu be purchased. (*Id.* ¶ 63.) The fourth factor tends to cut against a finding of reasonableness. *See* *Turner,* 482 U.S. at 90 ("[T]he the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns.").

***12** On balance, the foregoing considerations compel the conclusion that the Defendants' denial of Plaintiff's request for a religious diet was an unreasonable infringement upon his First Amendment right to freely practice his religious beliefs. Accordingly, it is respectfully recommended that Defendants' motion for summary judgment be denied with respect to Count II of the Plaintiff's complaint and that Plaintiff's motion for summary judgment be granted with respect to Defendants' liability on Count II.

*2. Plaintiff's RLUIPA Claim*

Defendants next argue that Plaintiff cannot establish a valid RLUIPA claim. The RLUIPA was created by Congress "to grant heightened protection to prisoners from burdens imposed by the government." *Washington v. Clemm,* 497 F.3d 272, 276 (3d Cir. 2007). To that end, Section 3 of the Act provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution" unless the government establishes that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that ... interest." 42 U.S.C. § 2000cc-1(a). Thus, the protections afforded by RLUIPA are more comprehensive than those provided by the First Amendment. *See* *Peele v. Klemm*, No. 16-1722, 2016 WL 6069186, at *3 (3d Cir. Oct. 17, 2016) ("[T]he Supreme Court reaffirmed in *Holt v. Hobbs,* ––– U.S. ––––, 135 S. Ct. 853, 862, 190 L.Ed.2d 747 (2015), that RLUIPA was passed to provide 'greater protection' for religious liberty than is provided by the First Amendment."); *Turner v. Coupe*, 655 Fed.Appx. 47, 49 (3d Cir. June 30, 2016) ("[T]he First Amendment imposes similar, but less strict, standards on prison administrators than RLUIPA.").

Initially, the Court must assess whether Defendants' conduct substantially burdened Plaintiff's ability to exercise his religious beliefs. Under the RLUIPA, "religious exercise" is defined to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). The Supreme Court has interpreted this definition as "bar[ring] inquiry into whether a particular belief or practice is central to a prisoner's religion." *Cutter v. Wilkinson,* 544 U.S. 709, 725 (2005). *See also* *Williams v. Bitner*, 359 F. Supp. 2d 370, 376 (M.D. Pa. 2005), *aff'd* 455 F.3d 186 (3d Cir. 2006) ("for purposes of the RLUIPA, it matters not whether the inmate's religious belief is shared by tens or tens of millions. All that matters is whether the inmate is sincere in his or her own views."); *Dehart v. Horn*, 227 F.3d 47, 55-56 (3d Cir. 2000) (finding it "unacceptable" to discount a Buddhist's belief in vegetarianism simply because it was not "mainstream" to Buddhism).

In this case, the record compels the conclusion that Plaintiff's request for a religious diet constituted "religious exercise" within the meaning of the RLUIPA. Plaintiff has provided competent evidence that his religious beliefs require him to maintain a vegan lifestyle and consume only foods that are prepared separately from animal product, because it is Plaintiff's belief that modern industrial animal breeding and slaughtering processes fail to show proper respect for the divine spirit of the animals that are slaughtered and thereby place the animals' spirits in turmoil. Plaintiff believes that these angry spirits can be transferred to him if he consumes meat from a tortured animal or consumes foods that were in contact with cookware or utensils used in the preparation of food product that was derived from a tortured animal. For reasons previously discussed, Defendants appear to concede the sincerity of Plaintiffs' religious beliefs inasmuch as they have not clearly contested this point in their brief. Defendants denied Plaintiff's request for an accommodation based on their conclusion that the diet he requested was not mandated by the Native American spiritual faith; as noted, however, these

considerations are invalid under the RLUIPA. 42 U.S.C. § 2000cc-5(7)(A).

***13** The question thus becomes whether Defendants' actions substantially burdened Plaintiff's ability to practice his religion. "For the purposes of RLUIPA, a substantial burden exists where: (1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other inmates versus abandoning one of the precepts of his religion in order to receive a benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Washington v. Klem*, 497 F.3d 272, 280 (3d Cir. 2007). In their summary judgment brief, Defendants contend that the DOC provided Plaintiff a diet that met both his medical and religious needs. To the extent Defendants are arguing that Plaintiff's First Amendment rights were not substantially burdened because the Alternative Protein Diet met Plaintiff's religious needs, the argument is unpersuasive. This line of reasoning rests on the assumption that Plaintiff's professed need for a modified Kosher diet is not a legitimate religious tenet of Native American spirituality; however, RLUIPA precludes this type of inquiry. *See* 42 U.S.C. § 2000cc-5(7)(A); *Cutter v. Wilkinson,* 544 U.S. 709, 725 (2005).

Plaintiff, on the other hand, has presented evidence to support his assertion that his religious rights were substantially burdened by Defendants' conduct. He has provided unrebutted testimony that the Defendants' denial of his requested accommodation placed him in the position of being forced to choose between adhering to his spiritual beliefs or consuming a nutritionally adequate diet from the prison's food services. Plaintiff was thus forced into a Hobson's choice of "either eating food items which offend [his] religious beliefs, or eating very little or not at all." *Norwood v. Strada,* 249 Fed.Appx. at 269, 272 (3d Cir. 2007). The Defendants' denial of Plaintiff's requested accommodation satisfies the standard of a "substantial burden." *See* *Holt v. Hobbs,* ––– U.S. ––––, 135 S. Ct. 853, 862 (2015) (substantial burden exists where policy requires plaintiff to "engage in conduct that seriously violates [his] religious beliefs") (internal quotations omitted).

Having substantially burdened Plaintiff's religious exercise, it was incumbent on the Defendants to demonstrate that their conduct was the least restrictive means available to meet a compelling penological interest. *See* *Washington*, 497 F.3d at 284. Nowhere in their summary judgment brief do Defendants argue that they can satisfy this burden.

First, Defendants have failed to identify any compelling penological interest that was served by denying Plaintiff's requested dietary accommodation. Their stated interest in simplifying food services cannot be considered compelling, given the lack of any evidence to suggest that Plaintiff's dietary request has placed a particularly onerous burden on the institution. *See, e.g.,* *Koger*, 523 F.3d at 800 (noting that orderly administration of prison dietary system has been held to be a legitimate penological interest, but not a compelling interest); *Shakur v. Schriro*, 514 F.3d 878, 890-91 (9th Cir. 2008) (questioning whether the expense of making Halal or Kosher meat available to Muslims would be large enough to be unduly burdensome); *see also* 42 U.S.C. § 2000cc-3(c) (RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise").

In addition, Defendants have not attempted to show that their denial of Plaintiff's dietary request was the least restrictive means available to achieve a compelling penological objective. As the Supreme Court has observed, "[t]he least restrictive means standard is exceptionally demanding," and "may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2780 (2014). The fact that the DOC currently provides a substantially similar accommodation to Jewish inmates and other Jewish-derived faith groups suggests that the denial of Plaintiff's requested meal accommodation is not the least restrictive means of advancing the DOC's penological interest.

***14** Defendants' primary basis for seeking summary judgment on the RLUIPA claim relates to Plaintiff's requested relief. Defendants correctly point out—and Plaintiff does not dispute—that RLUIPA does not allow for the recovery of compensatory damages against the Defendants in their individual capacities. *See* *Sharp v. Johnson,* 669 F. 3d 144, 155 (3d Cir. 2012) (joining the Fourth, Fifth, Seventh, and Eleventh Circuit Courts of Appeals in holding that RLUIPA does not permit an action against government employees in their individual capacities); *Ealy v. Keen,* No. 3:13-CV-2781, 2015 WL 1471577, at *9 (M.D. Pa. Mar. 31, 2015) (plaintiff

could not recover compensatory or punitive damages against defendants in either their individual or official capacities under RLUIPA).

Thus, the only relief that Plaintiff could obtain under the RLUIPA is declaratory or injunctive relief. However, Defendants insist that any request for injunctive relief is now moot because the DOC has, since March 2015, provided Plaintiff a diet that he concedes is compliant with his religious beliefs.

Article III of the United States Constitution requires that "an actual controversy must be extant at all stages of [the Court's] review, not merely at the time the complaint is filed." *Camesi v. Univ. of Pittsburgh Med. Ctr.,* 729 F.3d 239, 247 (3d Cir. 2013) (quoting *Genesis Healthcare Corp. v. Symczyk,* ––– U.S. ––––, 133 S.Ct. 1523, 1528 (2013)). Therefore, a claim which is moot presents a separate insurmountable jurisdictional defect. *See* *Mollett v. Leicth,* 511 Fed.Appx. 172, 173 (3d Cir. 2013) ("If a claim does not present a live case or controversy, the claim is moot, and a federal court lacks jurisdiction to hear it.") (citation omitted); *Goodmann v. People's Bank*, 209 Fed.Appx. 111, 113 (3d Cir. 2006) (noting that a "District Court lacks subject matter jurisdiction when the controversy has become moot"). "An action is rendered moot when 'an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during the litigation.' " *Camesi*, 729 F.3d at 247 (quoting *Szmczyk*, supra, at 1528) (internal quotation marks omitted). *See also* *Friends of the Earth, Inc. v.Laidlaw Envtl. Svcs.,* 528 U.S. 167, 189 (2000) (" 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.' ").

Nevertheless, "a claim will not be rendered moot if there remains the possibility that plaintiffs will be disadvantaged 'in the same fundamental way.' " *Sutton v. Rasheed,* 323 F.3d 236, 248-49 (3d Cir. 2003) (quoting *Northeastern Fla. Chapter of Assoc. Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 662 (1993)). *See also* *Friends of the Earth,* 528 U.S. at 189 (2000) ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways."). As the party asserting mootness, Defendants have the " 'heavy burden' of convincing the court that the alleged conduct will not begin again." *Bowers v. City of Phila.,* No. 06-CV-3229, 2007 WL 219651, at *32 (E.D. Pa. Jan. 25, 2007) (quoting *Friends of the Earth,* 528 U.S. at 189).

Plaintiff points out that, absent injunctive relief, his ability to receive a diet consistent with his religious beliefs "remains at the whim of Defendants who could transfer him to another institution without ensuring he continues to receive this diet, or simply cease providing the diet when this litigation concludes." (Pl.'s Br. Opp. Defs.' Mot. Summ. J. at 5, ECF No. 46.) "Should that occur," he argues, "[he] would have no recourse but to endure the violation of his constitutional rights for numerous months as he completed the lengthy religious accommodation and grievance process for yet a third time." (*Id.*) Plaintiff further notes, persuasively, that other federal courts within this circuit have rejected assertions of mootness where the voluntary cessation of a practice that violated a prisoner's constitutional rights was capable of recurrence. *See, e.g.,* *Williams v. Secy' Pa. Dep't of Corr.,* 541 Fed.Appx. 236, 240 n.6 (3d Cir. 2013) (defendants' voluntary cessation of challenged practice of placing a Christmas tree in the prison chapel did not moot plaintiff's claim); *Inmates of Northumberland Cty. Prison v. Reish,* No. 08-cv-345, 2009 WL 8670860, at *13-14 (M.D. Pa. Mar. 17, 2009) (Plaintiffs' constitutional challenge based on the alleged inadequacy of prison nursing staff was not moot despite the hiring of a second LPN and increased telephonic availability of medical staff; plaintiffs' challenge to recreational opportunities was not mooted by prison's erection of a fence for the purpose of separating segregated male inmates from general population inmates; both remediations could be undone in the absence of a court order, and the court therefore concluded that the case presented a "quintessential instance" where the voluntary cessation exception to the mootness doctrine should be employed); *Bowers v. City of Philadelphia,* No. CIV.A. 06-CV-3229, 2007 WL 219651, at *32 (E.D. Pa. Jan. 25, 2007) (remediation of prison overcrowding conditions did not moot plaintiffs' constitutional claims).

***15** Here, Defendants have proffered no mootness analysis in their summary judgment brief beyond their statement that, "[o]n May 29, 2015, Mr. Hall received a diet that met both his medical needs and his religious preferences." (Defs. Br. Supp. Mot. Summ. J. at 11, ECF No. 35.) Defendants' proffer fails to satisfy their "heavy burden" of establishing that Plaintiff's

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

claim for injunctive relief under the RLUIPA is moot. Moreover, the timing of their decision to voluntarily provide Plaintiff a religious diet in accordance with his professed beliefs belies a finding of mootness. *See Bowers,* 2007 WL 219651, at *32 ("The timing of the City's termination of the OSA—one week prior to the hearing on the Motion for Preliminary Injunction and on the same day that it sought a continuance of the injunction hearing—strongly suggests that the cessation was connected in large part to the instant litigation, a circumstance that does not favor a finding that the conduct is unlikely to recur.") Consequently, it is respectfully recommended that Defendants' motion for summary judgment be denied relative to Count I of the complaint and Plaintiff's motion for summary judgment be granted relative to Defendants' liability under Count I.

*3. Plaintiff's Damages Claim*

Finally, Defendants contend that Plaintiff's demand for compensatory damages for the alleged violation of this First Amendment rights must be dismissed. Defendants argue that any claim for damages is barred by 42 U.S.C. § 1997e(e) and by Plaintiff's failure to exhaust his administrative remedies.

Pursuant to the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §§ 1997, *et seq.,* "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). In order to satisfy § 1997d(e)'s physical injury requirement, a plaintiff must demonstrate a less than significant, but more than *de minimis* physical injury. *Mitchell v. Horn,* 318 F.3d 523, 533 (3d Cir. 2003); *see also Tsosie v. Bureau of Prisons,* No. 3:CV-10-2360, 2012 WL 4484935, at *3 (M.D. Pa. Sept. 27, 2012)(discussing *Mitchell* in the context of a claim under the Federal Torts Claims Act).

In his sworn declaration, Plaintiff states that his lack of a nutritionally adequate religious diet resulted in weight loss, dizziness, fatigue, and headaches. (Hall Decl. ¶¶ 30-31.) The evidence supports an inference that Plaintiff subsisted primarily on items from the commissary for substantial periods of time between August of 2012 and May of 2015. (*Id.* ¶¶ 30-35; Hall Dep. at 48:20-49:14.) Construed favorably to Plaintiff, the evidence is consistent with the types of physical injuries that other federal courts have recognized to be sufficient under § 1997e(e). *See, e.g., Munn v. Toney,* 433 F.3d 1087, 1089 (8th Cir. 2006) (headaches, cramps, nosebleeds, and dizziness were sufficient forms of physical injury); *Williams v. Hymphreys,* No. CIV A CV504-053, 2005 WL 4905109, at *7 (S.D. Ga. Sept. 13, 2005)(allegations that plaintiff suffered from nausea, abdominal pain, and weight loss as the result of failing to receive a nutritionally adequate religious diet were sufficient to satisfy the physical injury requirement of the PLRA).

This case is therefore distinguishable from *Allah v. Al-Hafeez,* 226 F.3d 247, 250-51 (3d Cir. 2000)—a case on which Defendants rely. In *Allah*, the plaintiff—a member of the Nation of Islam—claimed that his right to free exercise of religion had been violated by the prison's appointment of an outside minister, who was not a member of the Nation of Islam and whose teachings allegedly "contradicted the teachings of Elijah Muhammad, the leader of the Nation of Islam." 226 F.3d at 248. The Third Circuit Court of Appeals applied § 1997e(e) and, in doing so, affirmed the dismissal of the plaintiff's compensatory damages claim. *Id.* at 250-51. Notably, the court construed Allah's complaint as seeking only mental and/or emotional injury. *See* 226 F.3d at 250 ("As we read his complaint, the only actual injury that could form the basis for the award he seeks would be mental and/or emotional injury. Under § 1997e(e), however, in order to bring a claim for mental or emotional injury suffered while in custody, a prisoner must allege physical injury, an allegation that Allah undisputedly does not make."). By contrast, Plaintiff has proffered evidence of physical injuries in the case *sub judice* that are adequate, if credited, to provide a basis for recovery under § 1983 and the PLRA. [7]

***16** Defendants next argue that Plaintiff cannot recover damages for his physical injuries because he never grieved any physical symptoms or injury as the result of his request for a religious diet. As Plaintiff points out, though, "perfect overlap between the grievance and a complaint is not required by the PLRA," provided that "there is a shared factual basis between the two." *Jackson v. Ivens,* 244 Fed.Appx. 508, 513 (3d Cir. 2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 95, 126 S. Ct. 2378, 2388 (2006)). Having reviewed the complaint (ECF No. 1) as well as the administrative grievances in this case (Defs.' Ex. 1-A, ECF No. 37-2 at p.

3; Defs.' Ex. 10, ECF No. 37-11 at p. 7; Defs.' Ex. 11, ECF No. 37-11 at p. 9), this Court agrees with Plaintiff that there is sufficient factual overlap between the two so as to satisfy the administrative exhaustion requirement of the PLRA. *See* *Santos v. Meisel,* No. 13-3134, 2016 WL 2941075, at *5 (E.D. Pa. May 19, 2016) (inmate, who was assaulted by a fellow prisoner after being assigned to the assailant's housing unit, did not procedurally default his Eighth Amendment claim arising out of the assault where plaintiff inmate, having filed a pre-assault grievance complaining that he would be endangered by the housing assignment, did not file a second grievance after sustaining his injuries).

Moreover, the "determination whether a prisoner has 'properly' exhausted a claim (for procedural default purposes) is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances, and the waiver, if any, of such regulations by prison officials." *Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004). The Third Circuit Court of Appeals has stated that the prison procedures themselves are the proper "yardstick" for exhaustion. *Id.* at 231. Defendants make no reference in their brief to applicable administrative grievance procedures, nor have they included said procedures in their appendix. Accordingly, Defendants have not carried their burden of proving a failure to exhaust administrative remedies. *See* *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002) (defendants must prove failure to exhaust under the PLRA as an affirmative defense); *Walton v. Harkleroad*, No. 2:13-CV-1109, 2015 WL 2346806, at *1 (W.D. Pa. May 15, 2015) (recognizing that defendants have the burden of proving the affirmative defense of exhaustion).

## III. CONCLUSION

For the reasons that follow, it is respectfully recommended that Defendants' motion for summary judgment [ECF No. 34] be denied. It is further recommended that Plaintiff's cross-motion for summary judgment [ECF No. 38] be granted as to the issue of Defendants' liability under Counts I and II of the complaint.

In accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72, the parties must seek review by the district court by filing Objections to the Report and Recommendation within fourteen (14) days. Any party opposing the Objections shall have fourteen (14) days to respond thereto. Failure to file timely objections may constitute a waiver of appellate rights. *See* *Brightwell v. Lehman*, 637 F.3d 187, 194 n. 7 (3d Cir. 2011); *Nara v. Frank,* 488 F.3d 187 (3d Cir. 2007).

**All Citations**

Not Reported in Fed. Supp., 2017 WL 913954

## Footnotes

1 Citations to "PSMF ¶ ___" refer to Plaintiff's Concise Statement of Undisputed Material Facts (ECF No. 40) and Defendants' responses thereto (ECF NO. 50).

2 Throughout the record, Defendant Dugan is variously identified by the last name "Dugan" or "Dogan." To maintain consistency with the caption of this case, he is referred to herein as Defendant "Dugan."

3 Pursuant to DOC policy, Defendant Kephart is actually the Chairperson of the RARC, but he has delegated this responsibility to Defendant Klemm due to the large number of areas his department oversees. (PSMF ¶ 31.)

4 Citations to "DSMF ¶ ___" refer to the Defendants' Concise Statement of Undisputed Material Facts (ECF No. 36) and Plaintiff's responses thereto (ECF No. 47).

5 Plaintiff's claim is asserted pursuant to 42 U.S.C. § 1983, which affords individuals the right to seek redress for the actions of state officials that violate the individual's federal rights. To assert a claim under the §

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

1983, a plaintiff must demonstrate that he was deprived of a federal constitutional or statutory right by a person who was acting under color of state law. *See* *West v. Atkins*, 487 U.S. 42, 48 (1988). Because there is no dispute that the named Defendants acted under color of state law, the critical issue is whether Plaintiff has demonstrated a violation of his federal First Amendment rights.

6 Klemm and Kephart both testified it was their understanding that Kosher food was more costly than non-Kosher food. (*See* DSMF ¶¶ 131-132; Klemm Dep. at 139:22-25, 134:1-4; Kephart Dep. at 41:21-25, 22:1-3.) However, because of the manner in which food costs sheets and product lists are maintained, Defendants do not possess any data concerning the cost of individual diets. (PSMF ¶ 59.) The record reflects that there is no added labor cost associated with accommodating an inmate's diet. (*Id.* ¶ 65.)

7 In addition, Plaintiff is presumably entitled to recover damages for the out-of-pocket expenses he incurred in purchasing supplementary dietary items from the commissary during the period that his request for a religious diet was refused. *See Memphis Commty.* *Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986) (explaining that claims for compensatory damages under § 1983 based on alleged constitutional violations may include “out-of-pocket loss and other monetary harms”); *Ruiz v. Adamson*, No. 10 C 1632, 2012 WL 832986, at *8 (Mar. 8, 2012) (holding that “the PLRA cap does not apply to the monetary damages necessary to compensate Plaintiff for the money spent at the commissary to provide himself religiously appropriate food due to the failure to provide him an appropriate meal”). Notably, Defendant does not dispute this aspect of Plaintiff's damages claim. In addition, constitutional rights may be vindicated by an award of nominal damages in the absence of any showing of injury warranting compensatory damages. *See* *Allah v. Al-Hafeez*, 226 F.3d 247, 251 (3d Cir. 2000).

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.